**UNITED STATES of America ex rel. Robert Lee GOLDSBY, Appellant,**

v.

**William HARPOLE, Superintendent of the Mississippi State Penitentiary, Parchman, Mississippi, Appellee.**

**No. 17300.**

United States Court of Appeals
Fifth Circuit.

Jan. 16, 1959.

Rehearing Denied March 17, 1959.

George N. Leighton, Chicago, Ill., for appellant.

Joe T. Patterson, Atty. Gen., J. R. Griffin, Asst. Atty. Gen., Ross R. Barnett, Jackson, Miss., for appellee.

Before RIVES, BROWN, and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

On September 4, 1954, Bryant Nelms, a white man, and Mrs. Moselle McCorkle Nelms, his wife, were shot by one or more Negroes firing from an automobile after Nelms had ordered the Negroes to leave his gasoline filling station and dairy bar near Vaiden, Mississippi. Mrs. Nelms was killed. Later that same day, Robert Lee Goldsby and several other Negroes in an automobile with him were apprehended and lodged in jail. There was evidence to the effect that a .32 caliber bullet was removed from the body of Mrs. Nelms; that a pistol was obtained by the sheriff from appellant's possession when he was arrested; that the two were sent to the F.B.I. Laboratory in Washington, D. C.; and that there a ballistics examination identified the bullet as having been fired from appellant's pistol.

On his preliminary trial, the appellant was represented by Messrs. Tighe and Tighe, a law firm of Jackson, Mississippi. On November 8, 1954, a Grand Jury of the Second Judicial Circuit of Carroll County, Mississippi, indicted the appellant for the murder of Mrs. Nelms. By that time, an aunt who lived in Gary, Indiana, had employed George N. Leighton, Esquire, a Negro attorney of Chicago, Illinois, to defend the appellant. Mr. Leighton appeared with him on his arraignment, the same day that the in-

dictment was returned. A plea of not guilty was entered. The attorney requested and the court granted time for the preparation of motions necessary to raise certain constitutional questions.

November 10th, allowing a lapse of two days, was set as the date of trial. Before that time the attorney had ready for filing a motion to quash the indictment on the ground that Negroes had been systematically excluded from the grand jury, a motion for change of venue, and a petition for removal of the case to the federal court.[1] Before they could be filed, however, appellant's brother and a different aunt had employed John W. Prewitt, Esquire, a white attorney of Vicksburg, Mississippi. Mr. Prewitt told these relatives of appellant that he could not work with the Negro attorney, Mr. Leighton. They informed Leighton of their employment of Prewitt and requested Leighton's withdrawal. Leighton promptly advised the District Attorney and thereafter the court that he was withdrawing from the case. The motions which he had prepared were never filed.

The court then appointed Luther Ringgold, Esquire, a white attorney of Winona, Mississippi, to defend the appellant. Mr. Ringgold informed the court that relatives had employed Mr. Prewitt, and both Ringgold and Prewitt defended the appellant skillfully and ably, with the possible exception that they failed to raise the points that Negroes were systematically excluded from the grand jury and from the petit jury. The appellant was convicted and sentenced to death.

On appeal to the Supreme Court of Mississippi, his conviction was affirmed.[2]

Attorneys Ringgold and Prewitt took no further action and have not since appeared in the case. Attorney Leighton re-entered the case and applied for a writ of certiorari to the Supreme Court of the United States, actually urging for the first time the systematic exclusion of Negroes from the grand jury and from the petit jury. Certiorari was denied by the Supreme Court of the United States.[3] The Supreme Court of Mississippi then fixed the date of appellant's execution for February 24, 1956.[4]

Three days theretofore, on February 21, 1956, Mr. Leighton filed for the appellant in the Supreme Court of Mississippi[5] a petition for writ of error coram nobis, or, in the alternative, habeas corpus, asserting for the first time in the State courts the systematic exclusion of Negroes from the jury lists. The Supreme Court of Mississippi held that the denial of certiorari by the United States Supreme Court was res judicata of the question,[6] and that the application came too late since no objection to the validity of the juries had been made at the time of trial.[7]

Attorney Leighton again petitioned for certiorari to the Supreme Court of the United States. The Clerk of the Supreme Court requested the Attorney General of Mississippi to file a response, stating, "The response should discuss particularly the issues of systematic exclusion of negroes from the grand and petit jury panel and the state procedure for raising this question in a post convic-

---

1. Under 28 U.S.C.A. § 1443 and §§ 1446–1449.

2. Goldsby v. State, 1955, 226 Miss. 1, 78 So.2d 762.

3. Goldsby v. State, 1955, 350 U.S. 925, 76 S.Ct. 216, 100 L.Ed. 809.

4. Goldsby v. State, 1956, 226 Miss. 1, 84 So.2d 528.

5. Pursuant to Chapter 250 of the Laws of Mississippi of 1952, Section 1992.5, Code of 1942, Recompiled.

6. In that respect, certainly the holding was erroneous. "The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times." United States v. Carver, 1923, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361. See also, Darr v. Burford, 1949, 339 U.S. 200, 202, 226–228, 70 S.Ct. 587, 94 L.Ed. 761, dissenting opinion of Mr. Justice Frankfurter.

7. Goldsby v. State, 1956, 226 Miss. 1, 86 So.2d 27.

tion proceeding." Such a response was of course filed. The Supreme Court denied certiorari.[8] The Supreme Court of Mississippi again set a date for execution, this time for February 12, 1957.[9]

On January 29, 1957, Attorney Leighton filed for the appellant a petition for writ of habeas corpus in the United States District Court for the Northern District of Mississippi, Greenville Division. Honorable Allen Cox, United States District Judge, after hearing argument but without waiting for an answer, denied the petition on the same day that it was filed and also denied a certificate of probable cause.

On February 8, 1957, a motion for stay of execution was denied by Honorable Wayne G. Borah, a Judge of this Court. On February 11, 1957, the Honorable Earl Warren, Chief Justice of the United States, granted a stay of execution "until petitioner has had an opportunity to exhaust his federal rights in this proceeding." This Court thereafter heard the appeal from the decision of Judge Cox and reversed and remanded the cause for a hearing of the evidence.[10]

Upon remand the case was heard at a special session of the court before Honorable Claude F. Clayton, United States District Judge. At the conclusion of the evidence and after hearing argument, Judge Clayton denied the petition, expressing his views in an oral opinion as follows:

"Mr. Court Reporter, take this:

"The issues of fact, as I understand them in this proceeding, are very much as I stated at the beginning of this hearing. For the benefit of counsel in any further proceeding that may arise, I will state my findings of fact and conclusions of law separately.

"First: The proof shows, as I indicated to counsel for petitioner before he made his argument, that the grand jury which returned the indictment against this petitioner had no Negroes on it.

"Second: The proof shows that the petit jury which tried the petitioner had no Negroes on it.

"Third: The proof fails to meet the burden, as I understand it, of showing a 'systematic and willful' exclusion of any member of the Negro race from jury service in that county.

"Fourth: As a matter of fact, it is rather difficult for the Court to distinguish between fact and law in the twilight zone that arises between the two, but as a matter of fact the Court finds that the petitioner has, and had, at the time of his indictment and trial a high school education, and finds as a fact that he was twenty-eight years old at the time; and finds as a fact that he was represented at the preliminary aspect of the matter by counsel, who were chosen for him by some means not shown by testimony in this record—they being the firm of Tighe & Tighe of Jackson, Mississippi; next, that he was represented by counsel, as the record shows, of his family's selection, Mr. Leighton, at his arraignment; that he was represented by able and competent counsel of his family's selection and employment throughout the trial and in the Supreme Court of Mississippi on appeal, and that in addition he was represented by able counsel appointed by the Circuit Court of Carroll County.

"With these factual findings, the Court could not do otherwise than conclude, as a matter of law, that ample opportunity was afforded this petition to raise in the courts of the State of Mississippi, the constitu-

---

8. Goldsby v. State, 1956, 352 U.S. 944, 77 S.Ct. 266, 1 L.Ed.2d 239.

9. Goldsby v. State, 1957, 226 Miss. 1, 91 So.2d 750.

10. United States ex rel. Goldsby v. Harpole, 5 Cir., 1957, 249 F.2d 417.

tional question involved in this hearing, and undoubtedly if the question of the absence of Negroes from the grand jury and the absence of Negroes from the petit jury had been presented in the Circuit Court of Carroll County by a proper motion to quash, such a motion would have been sustained. That is borne out by the case I cited to counsel, Farrow v. State, 91 Mississippi 509, 45 Southern 619, decided in 1908.

"The opportunity was there, the decision was made by competent counsel of the family's employment and of the Court's appointment not to raise that question and not to invoke that issue in the lawsuit.

"Under these circumstances, the Court is of the opinion that the petitioner understandingly, in connection with his counsel, waived whatever right he may have had to present any question with respect to the composition of the jury, and that he, therefore, is barred from raising the question here or prevailing on that question being raised in this Court.

"The Court is further of the opinion that the motion for taking of depositions in Chicago is not only untimely, having been filed too late, but from statement of counsel as to the purpose of taking the testimony of those witnesses, in the light of the Court's findings that I have given you, the testimony would not be of any help here."

Judge Clayton refused to issue a certificate of probable cause, and the Supreme Court of Mississippi again set a date for execution, this time for May 29, 1958.[11] On May 27, 1958, the Chief Justice of the United States again granted a stay of execution "until the petitioner has had an opportunity to exhaust his federal rights in this habeas corpus proceeding." Upon consideration, we now grant a certificate of probable cause.[12]

11. Goldsby v. State, Miss.1958, 102 So.2d 215.

The present appeal is from Judge Clayton's decision and presents the questions of whether Negroes were systematically excluded from the grand jury and from the petit jury, and whether those objections were waived as to both the grand jury and the petit jury, when not taken on the trial. In so far as it pertains to those issues, the documentary evidence and the testimony of each of the witnesses are summarized at some length in an appendix to this opinion.

I.

Were Negroes Systematically Excluded from the Grand Jury and the Petit Jury or from Either.

■ No question is or can be raised as to the validity of the constitutional principle here involved. In Norris v. State of Alabama, 1935, 294 U.S. 587, 589, 55 S.Ct. 579, 580, 79 L.Ed. 1074, Chief Justice Hughes, speaking for a unanimous Court, expressed it as follows:

"* * * Summing up precisely the effect of earlier decisions, this Court thus stated the principle in Carter v. State of Texas, 177 U.S. 442, 447, 20 S.Ct. 687, 44 L.Ed. 839, in relation to exclusion from service on grand juries: 'Whenever by any action of a state, whether through its Legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States. Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664; Neal v. Delaware, 103 U.S. 370, 397, 26 L. Ed. 567; Gibson v. State of Mississippi, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075.' This statement was re-

12. See 28 U.S.C.A. § 2253.

peated in the same terms in Rogers v. State of Alabama, 192 U.S. 226, 231, 24 S.Ct. 257, 48 L.Ed. 417, and again in Martin v. State of Texas, 200 U.S. 316, 319, 26 S.Ct. 338, 50 L.Ed. 497. The principle is equally applicable to a similar exclusion of negroes from service on petit juries. Strauder v. State of West Virginia, supra; Martin v. State of Texas, supra."

Many of the pertinent Supreme Court cases are collected in annotations in 94 L.Ed. 856 and 97 L.Ed. 1249. The later cases have been no less positive in sustaining the principle.[13]

The right is protected also by statute. 18 U.S.C.A. § 243 reads as follows:

"Exclusion of jurors on account of race or color

"No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude; and whoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000."

Addressing itself particularly to the manner of selection of juries from lists of qualified electors prevailing in Mississippi,[14] a unanimous Supreme Court declared in Patton v. State of Mississippi, 1947, 332 U.S. 463, 469, 68 S.Ct. 184, 187, 92 L.Ed. 76:

" * * * When a jury selection plan, whatever it is, operates in such way as always to result in the complete and long-continued exclusion of any representative at all from a large group of Negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand."

In Eubanks v. State of Louisiana, 1958, 356 U.S. 584, 587, 78 S.Ct. 970, 973, 2 L.Ed.2d 991, again by a unanimous Court, the foregoing statement from the Patton case, supra, was quoted with approval, to which the Court added:

" * * * This is essentially the situation here. True, the judges now serving on the local court testified generally that they had not discriminated against Negroes in choosing grand juries, and had only tried to pick the best available jurors. But as Chief Justice Hughes said for the Court in Norris v. State of Alabama, 294 U.S. 587, 598, 55 S.Ct. 579, 584, 79 L.Ed. 1074, 'If, in the presence of such testimony as defendant adduced, the mere general assertions by officials of their performance of duty were to be accepted as an adequate justification for the complete exclusion of negroes from jury service, the [Equal Protection Clause]—adopted with special reference to their protection— would be but a vain and illusory requirement.' Compare Reece v. State of Georgia, 350 U.S. 85, 88, 76 S.Ct. 167, 169, 100 L.Ed. 77; Hernandez v. State of Texas, 347 U.S. 475, 481, 74 S.Ct. 667, 671, 98 L.Ed. 866."

It can no longer be doubted that proof of long-continued exclusion of Negroes from jury service makes a "strong prima facie case." Norris v. State of Alabama, supra, 294 U.S. at page 598, 55 S.Ct. at page 584.[15] In Hernandez v. State of Texas, 1954, 347 U.S. 475, 480, 74 S.Ct. 667, 671, the holding was that persons of Mexican descent were syste-

13. See, e. g., Hernandez v. State of Texas, 1954, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866; Reece v. State of Georgia, 1955, 350 U.S. 85, 76 S.Ct. 167, 100 L. Ed. 77; Eubanks v. State of Louisiana, 1958, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed. 2d 991.

14. See Title 10, Chapter 9, Sections 1762–1802, Vol. 2, Mississippi Code 1942 Ann.

15. See also, Patton v. State of Mississippi, 1947, 332 U.S. 463, 468, 68 S.Ct. 184, 92 L.Ed. 76; Reece v. State of Georgia, 1955, 350 U.S. 85, 88, 76 S.Ct. 167, 100 L.Ed. 77.

matically excluded from jury service. As to the proof necessary to sustain the charge of discrimination, the Court said:

"Having established the existence of a class, petitioner was then charged with the burden of proving discrimination. To do so, he relied on the pattern of proof established by Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 584, 79 L.Ed. 1074. In that case, proof that Negroes constituted a substantial segment of the population of the jurisdiction, that some Negroes were qualified to serve as jurors, and that none had been called for jury service over an extended period of time, was held to constitute prima facie proof of the systematic exclusion of Negroes from jury service. This holding, sometimes called the 'rule of exclusion,' has been applied in other cases, and it is available in supplying proof of discrimination against any delineated class."

In the present case, the naked figures prove startling enough. According to the 1950 United States Census, Carroll County, Mississippi, had a population of 15,448 persons, of which 8,836 or more than fifty-seven per cent were nonwhite, predominantly Negroes.[16] Of the nonwhite population, 1,949 were males twenty-one years of age and over.[17] The median school years completed by the nonwhite population of Carroll County, twenty-five years of age and over, were 5.2 years. Yet none of the officials called as witnesses—the Circuit Clerk, the Chancery Clerk, the Sheriff, the ex-Sheriff who had served for twenty years, the District Attorney, or the Circuit Judge —could remember any instance of a Negro having been on a jury list of any kind in Carroll County.[18]

We cannot assume that Negroes, the majority class in Carroll County, had en masse, or in any substantial numbers, voluntarily abstained from registering as electors [18a] and, by such action, had rendered themselves ineligible for jury duty. If the registration officials freely and fairly registered qualified Negroes as electors, that fact rested more in the knowledge of the State. The burden was on appellee, as the State's representative, to refute the strong prima facie case developed by the appellant.[19] The only Negroes ever proved registered as electors in Carroll County were two who had died before 1954.

We have called the figures startling, but we do not feign surprise because we have long known that there are counties not only in Mississippi, but in the writer's own home State of Alabama,[20] in which Negroes constitute the majority of the residents but take no part in government either as voters or as jurors. Familiarity with such a con-

16. Of the male nonwhite population, 4,412 were Negroes, 4 were of other races. Of the female nonwhite population, 4,417 were Negroes, 3 were of other races.

17. Only males twenty-one years of age and over could be competent jurors in Mississippi. Section 1762, Vol. 2, Mississippi Code 1942 Ann.

18. That is true even if full weight be given to the testimony of several of the officials to the effect that they were unable accurately to distinguish between whites and Negroes. That testimony tends to negative the sharp distinction between whites and Negroes habitually drawn in nearly all parts of the South. We would expect that distinction to be no less definite in Mississippi in the light of the decision of the Mississippi Supreme Court to the effect that " * * *

descendants of Africans are classed as members of the colored race, regardless of the admixture, as long as there is an appreciable amount of negro blood found." Moreau v. Grandich, 1917, 114 Miss. 560, 75 So. 434, 435.

18a. As has been said, in Mississippi, to be eligible for jury duty one must be a qualified elector. See Footnote 14, supra.

19. Patton v. State of Mississippi, and Reece v. State of Georgia, supra, note 15.

20. Compare Davis v. Schnell, D.C.S.D.Ala. 1949, 81 F.Supp. 872, 879, affirmed as Schnell v. Davis, 1949, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 and the public debates which preceded the adoption of the "Boswell Amendment" there declared unconstitutional.

dition thus prevents shock, but it all the more increases our concern over its existence.[21] When, in a proper case such as this, there is added to our common knowledge proof that some of the Negro citizens are qualified educationally and by other legal standards but are excluded from serving as jurors solely because of their race or color, the courts must declare the maintenance of such a condition violative of the Constitution and must not tolerate its longer continued existence.

In our opinion, the appellant proved a strong prima facie case that Negroes were systematically excluded from the grand jury and from the petit jury, and that case was not refuted by the State.

## II.

### Were Objections to Systematic Exclusion of Negroes Effectively Waived?

The more serious questions are whether objections to the systematic exclusion of Negroes from the grand jury and to a like exclusion from the petit jury were waived when they were not made at the trial.

In deciding those questions, we should understand exactly the nature of the right under consideration. Usually the discrimination has been condemned as a denial of the equal protection of the laws. It has been indicated, however, that under certain circumstances it may constitute also a denial of due process of law.[22]

The denial of the equal protection of the laws is especially marked when the defendant is a Negro and the victim is a white person; that is when the right is viewed narrowly and strictly from the viewpoint of the accused. Looking at it more broadly from the interest of the public in the administration of justice, systematic exclusion of Negroes from juries can result in inadequate protection of law-abiding Negroes against the criminal elements of their own race. The necessity for protection may not be brought close enough home to white jurors to prevent them from being too lenient with Negroes who commit crimes against other Negroes. The Constitution provides to law-abiding Negroes also the safeguard that members of their race shall not be systematically excluded from juries. The denial of the equal protection of the laws extends also to civil cases in which the lists of jurors

21. Situations like that were disturbing at a much earlier period of our Country's life. In 1832, more than a century and a quarter ago, de Tocqueville wrote:
"I said one day to an inhabitant of Pennsylvania: 'Be so good as to explain to me how it happens that in a state founded by Quakers, and celebrated for its toleration, free blacks are not allowed to exercise civil rights. They pay taxes; is it not fair that they should vote?'
" 'You insult us,' replied my informant, 'if you imagine that our legislators could have committed so gross an act of injustice and intolerance.'
" 'Then the blacks possess the right of voting in this country?'
" 'Without a doubt.'
" 'How come it, then, that at the polling-booth this morning I did not perceive a single Negro?'
. " 'That is not the fault of the law. The Negroes have an undisputed right of voting, but they voluntarily abstain from making their appearance.'

" 'A very pretty piece of modesty on their part!' rejoined I.
" 'Why, the truth is that they are not disinclined to vote, but they are afraid of being maltreated; in this country the law is sometimes unable to maintain its authority without the support of the majority. But in this case the majority entertains very strong prejudices against the blacks, and the magistrates are unable to protect them in the exercise of their legal rights.'
" 'Then the majority claims the right not only of making the laws, but of breaking the laws it has made?' "
Democracy in America by Alexis de Tocqueville, Vol. 1, Chapter 15, page 261, quoted by Professor Roland M. Harper of the University of Alabama in his letter to the Editor of the Montgomery Advertiser published December 17, 1958.

22. See Fay v. People of State of New York, 1947, 332 U.S. 261, 284, note 27, 67 S.Ct. 1613, 91 L.Ed. 2043; Akins v. State of Texas, 1945, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692.

are drawn from a jury box from which the names of Negroes have been systematically excluded. Thus, the right is one of broad significance closely and vitally connected with the proper administration of justice in both civil and criminal cases.

Mr. Justice Jackson dissenting in Cassell v. State of Texas, 1950, 339 U.S. 282, 301, 70 S.Ct. 629, 638, 94 L.Ed. 839, commented that,

> " * * * in the earlier cases where convictions were set aside, the discrimination condemned was present in selecting *both grand and trial jury* and, while the argument was chiefly based on the latter, the language of the opinions made no differentiation, nor for their purpose did they need to. Cf. Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664; Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567; see also Bush v. Commonwealth of Kentucky, 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354; Gibson v. State of Mississippi, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075; Hale v. Commonwealth of Kentucky, 303 U.S. 613, 58 S.Ct. 753, 82 L.Ed. 1050." [23]

Continuing, Mr. Justice Jackson said:

> "It is obvious that discriminatory exclusion of Negroes from a trial jury does, or at least may, prejudice a Negro's right to a fair trial, and that a conviction so obtained should not stand. The trial jury hears the evidence of both sides and chooses what it will believe. In so deciding, it is influenced by imponderables— unconscious and conscious prejudices and preferences—and a thousand things we cannot detect or isolate in its verdict and whose influence we cannot weigh. A single juror's dissent is generally enough to prevent conviction. A trial jury on which one of the defendant's race has no chance to sit may not have the sub-

stance, and cannot have the appearance, of impartiality, especially when the accused is a Negro and the alleged victim is not.

> "The grand jury is a very different institution. The States are not required to use it at all. Hurtado v. People of State of California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232. Its power is only to accuse, not to convict. Its indictment does not even create a presumption of guilt; all that it charges must later be proved before the trial jury, and then beyond a reasonable doubt. The grand jury need not be unanimous. It does not hear both sides but only the prosecution's evidence, and does not face the problem of a choice between two adversaries. Its duty is to indict if the prosecution's evidence, unexplained, uncontradicted and unsupplemented, would warrant a conviction. If so, its indictment merely puts the accused to trial. The difference between the function of the trial jury and the function of the grand jury is all the difference between deciding a case and merely deciding that a case should be tried." Cassell v. State of Texas, supra, 339 U.S. at pages 301, 302, 70 S.Ct. at pages 638, 639.

■ Mr. Justice Jackson's dissenting opinion is, of course, entitled to no weight as a precedent. We think, however, that the quoted reasoning is sound. Further, the Supreme Court of Georgia, in language not less forceful, has also pointed out how much more important to an accused is the right to a fair and nondiscriminatory jury in the case of a trial jury than in that of a grand jury. Hall v. State, 1909, 7 Ga.App. 115, 66 S.E. 390, 392. It may be significant that in Michel v. State of Louisiana, 1955, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83, attention was called three times (350 U.S. at pages 93, 96, and 99, 76 S.Ct. at pages 160, 161, and 163) to the fact that

---

23. In addition to the cases cited by Mr. Justice Jackson, see those collected and separated as to the type of jury involved

in annotations in 94 L.Ed. 856 and 97 L. Ed. 1249.

there no attack was made on the composition of the petit jury.

██ Usually it is clear, and in the present case especially so, that, regardless of its composition, any grand jury would insist that the accused be brought to trial. When it comes to the actual trial, however, the decision of whether to submit to trial before a jury in the selection of which the defendant's race has been systematically excluded presents a problem fraught with far more serious consequences. The apprehended existence of prejudice was one inducement which led to the adoption of the Fourteenth Amendment.[24] Systematic exclusion of members of a defendant's race from a trial jury would, we think, be violative both of the equal protection clause and of the due process clause of the Fourteenth Amendment.

Such positive discrimination is more serious and damaging than the mere negative absence of one of the twelve jurors considered in Patton v. United States, 1930, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854. In that case, the Supreme Court said:

"* * * Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant. And the duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity." 281 U.S. at pages 312, 313, 50 S.Ct. at page 263.

██ The United States Constitution does not guarantee to a defendant in a State court a trial before a jury in which his race is proportionately represented,

24. "* * * It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy. Prejudice in a local community is held to be a reason for a change of venue. The framers of the constitutional amendment must have known full well the existence of such prejudice and its likelihood to continue against the manumitted slaves and their race, and that knowledge was doubtless a motive that led to the amendment. By their manumission and citizenship the colored race became entitled to the equal protection of the laws of the States in which they resided; and the apprehension that through prejudice they might be denied that equal protection, that is, that there might be discrimination against them, was the inducement to bestow upon the national government the power to enforce the provision that no State shall deny to them the equal protection of the laws. Without the apprehended existence of prejudice that portion of the amendment would have been unnecessary, and it might have been left to the States to extend equality of protection. "In view of these considerations, it is hard to see why the statute of West Virginia should not be regarded as discriminating against a colored man when he is put upon trial for an alleged criminal offence against the State. It is not easy to comprehend how it can be said that while every white man is entitled to a trial by a jury selected from persons of his own race or color, or, rather, selected without discrimination against his color, and a negro is not, the latter is equally protected by the law with the former. Is not protection of life and liberty against race or color prejudice, a right, a legal right, under the constitutional amendment? And how can it be maintained that compelling a colored man to submit to a trial for his life by a jury drawn from a panel from which the State has expressly excluded every man of his race, because of color alone, however well qualified in other respects, is not a denial to him of equal legal protection?" Strauder v. State of West Virginia, 1879, 100 U.S. 303, 309, 25 L.Ed. 664.

nor a trial before a jury composed in any part of members of his race,[25] nor even to a jury trial at all, if other defendants are not accorded a jury trial.[26] It does assure him of equal treatment under the law and that, so long as the State elects to accord jury trials, it must not systematically exclude from jury service qualified persons of his race. "An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." Cassell v. State of Texas, supra, 339 U.S. at page 287, 70 S.Ct. at page 632.

The fact that the prohibition is aimed at a system often makes it practically inadvisable for a defendant in a particular case to raise the issue. If Negroes were placed upon the list or venire, their names might easily be stricken before the particular jury was selected and impaneled. To a single defendant, then, the principle involved is often of doubtful or no value and he may forego seeking its protection, though it cannot be denied that from a broader, overall consideration, the long-continued, systematic and arbitrary exclusion of qualified Negro citizens from service on juries solely because of their race or color deprives every Negro of the equal protection of the law.

Moreover, the very prejudice which causes the dominant race to exclude members of what it may assume to be an inferior race from jury service operates with multiplied intensity against one who resists such exclusion. Conscientious southern lawyers often reason that the prejudicial effects on their client of raising the issue far outweigh any practical protection in the particular case.

Many entertain the view expressed by Mr. Justice Jackson concurring in the result in Shepherd v. State of Florida, 1951, 341 U.S. 50, 55, 71 S.Ct. 549, 551, 95 L.Ed. 740:

" * * * I do not see, as a practical matter, how any Negro on the jury would have dared to cause a disagreement or acquittal. The only chance these Negroes had of acquittal would have been in the courage and decency of some sturdy and forthright white person of sufficient standing to face and live down the odium among his white neighbors that such a vote, if required, would have brought. To me, the technical question of discrimination in the jury selection has only theoretical importance."

Such courageous and unselfish lawyers as find it essential for their clients' protection to fight against the systematic exclusion of Negroes from juries sometimes do so at the risk of personal sacrifice which may extend to loss of practice and social ostracism.

As Judges of a Circuit comprising six states of the deep South, we think that it is our duty to take judicial notice that lawyers residing in many southern jurisdictions rarely, almost to the point of never, raise the issue of systematic exclusion of Negroes from juries. The Supreme Court of Mississippi has said that, "We have the right to make use of knowledge of the popular and general customs of the people of this State, and public conditions therein." Moore v. Grillis, 1949, 205 Miss. 865, 39 So.2d 505, 508, 10 A.L.R.2d 1425. A like authority and duty is vested in this Court.[27]

25. Commonwealth of Virginia v. Rives, 1879, 100 U.S. 313, 322–323, 25 L.Ed. 667; Neal v. Delaware, 1880, 103 U.S. 370, 394, 26 L.Ed. 567; Martin v. State of Texas, 1906, 200 U.S. 316, 321, 26 S.Ct. 338, 50 L.Ed. 497; Cassell v. State of Texas, 1950, 339 U.S. 282, 287, 70 S.Ct. 629, 94 L.Ed. 839.

26. Maxwell v. Dow, 1900, 176 U.S. 581, 20 S.Ct. 494, 44 L.Ed. 597; Snyder v. Commonwealth of Massachusetts, 1934, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674.

27. City of Hughes Springs, Tex. v. Lips, 5 Cir., 1941, 118 F.2d 238; Rogers v. Douglas Tobacco Board of Trade, 5 Cir., 1957, 244 F.2d 471, 478; Mays v. Burgess, 1945, 79 U.S.App.D.C. 343, 147 F.2d 869, 873, 162 A.L.R. 168; 20 Am.Jur., Evidence, Sec. 108.

█

 The evidence in this case (see appendix) fairly considered shows no waiver by the appellant himself but at most by his counsel without his express authority. In ordinary procedural matters, the defendant in a criminal case is bound by the acts or nonaction of his counsel.[28] That might extend to the waiver of the objection that Negroes were systematically excluded from the grand jury. In noncapital cases, it might extend to a like waiver as to the petit jury. It might extend to such a waiver even in capital cases, where the record affirmatively shows that the particular jury was desired by defendant's counsel after conscientious consideration of that course of action which would be best for the client's cause.[29]

 In this case, neither of the petitioner's trial attorneys has appeared or has been called to testify to any reason for waiving his client's constitutional right to a legally constituted trial jury, and no good reason appears otherwise from the record. The very heinousness of the crime and the weight of the physical evidence[30] made it all the more necessary that the defendant's constitutional rights be not lightly or unadvisedly surrendered. The State trial judge testified that, "had such a motion been made and proved, that would have been sustained." As Judge Clayton commented, that is borne out by the case of Farrow v. State, 1908, 91 Miss. 509, 45 So. 619. However strong might be the evidence of guilt, there was a possibility that a nondiscriminatory jury might not impose capital punishment. That chance was waived by defendant's counsel, so the District Court held.

If for any reason beyond the defendant's control, upon his trial for murder, the defendant did not have the effective representation of counsel at the time of a purported waiver by such counsel without consulting the client of the right to be tried before a legally constituted jury, such waiver can be given no effect.[31]

 Even in handling civil litigation, there are limitations upon the implied authority of an attorney to make decisions for his client.[32] Few, if any, would argue that, without consulting his client, an attorney has implied authority to submit his cause to arbitration, or to any but a legally constituted tribunal. When not merely the client's property but his life is at stake, it is all the more essential that an attorney should advise with his client before waiving objections to a trial jury unconstitutionally and discriminatorily constituted.

The Negro lawyer was ready and willing to raise the issue of systematic exclusion of Negroes from the juries. The white lawyer, who was retained, refused to join with the Negro lawyer in the defense of appellant. When, upon request of the appellant's relatives, the Negro lawyer had left the case, the white lawyers failed to raise the issue. When the white lawyers had finished with the trial of the case, that issue was left as the only one that could save the appellant's life. The Negro lawyer then took over and raised the issue.

In Johnson v. Zerbst, 1938, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, the Supreme Court declared:

"* * * It has been pointed out that 'courts indulge every rea-

28. See Floyd v. United States, 5 Cir., 260 F.2d 910, and cases there cited; Mitchell v. United States, D.C.Cir., 259 F.2d 787.

29. See Williams v. State of Georgia, 1955, 349 U.S. 375, 377, 378, 379, 75 S.Ct. 814, 99 L.Ed. 1161; Id., 211 Ga. 763, 88 S.E.2d 376; Carruthers v. Reed, 8 Cir., 1939, 102 F.2d 933, 938; United States ex rel. Jackson v. Brady, 4 Cir., 1943, 133 F.2d 476, 481.

30. See the first paragraph of this opinion.

31. See Bovey v. Grandsinger, 8 Cir., 1958, 253 F.2d 917, 922; 53 Michigan Law Review (1954–55). Recent Decisions, pp. 885–887, commenting on Harvey v. United States, 1954, 94 U.S.App.D.C. 303, 215 F.2d 330, and Judge Danaher's dissent in that case: compare Mitchell v. United States, supra note 28.

32. 5 Am.Jur., Attorneys at Law, Sec. 92; 7 C.J.S. Attorney and Client § 100, pp. 919, 922.

sonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."[33]

The conditions giving rise to serious doubt as to whether the failure to make the objection at the trial constituted a voluntary and intelligent waiver of appellant's constitutional rights are all matters for which the State of Mississippi must bear responsibility. It is in a poor position to insist upon waiver.[34] Upon this record, we hold that the appellant's constitutional right to be tried before a petit jury from which Negroes have not been systematically excluded has not been effectively waived by counsel authorized to make such waiver.

We have considered remanding this cause again for the development of a more full and adequate record. No record was developed originally, and our previous decision (249 F.2d 417) remanded the case so that the evidence might be heard and considered. The appellant has been confined to jail or in the penitentiary for more than four years, and has not yet been tried before a legally constituted petit jury, nor has his right to such a trial been effectively waived. Inevitably, more months must elapse before he can be tried in conformity with the Constitution. We have concluded that to remand the case again for

development of the record is not consistent with the promptness of disposition so essential in habeas corpus proceedings, nor with the right of the appellant to a speedy as well as a fair trial.

 Upon the present record, therefore, we make definitive holdings as follows: that Negroes were systematically excluded both from the grand jury which indicted the appellant and from the petit jury which convicted him; that the objection as to the petit jury was not effectively waived and, hence, that the judgment of conviction is unconstitutional, subject to collateral attack, and is declared to be void and of no effect; that the objection as to the grand jury was waived, and the appellant is now legally detained upon his indictment for murder, but that he is entitled to be tried within a reasonable time; that this Court retains jurisdiction for the entry of such further orders and judgments as may be necessary or proper.[35]

 The Court expresses its present opinion that a period of eight months from and after the entry of this judgment or its final test by certiorari or otherwise will be sufficient to afford the State of Mississippi an opportunity to take the necessary steps to re-try the appellant, either upon the present indictment or upon a subsequent legal presentment for the same offense, as the State may elect. If the appellant has not been re-tried within such period, this Court will consider and decide whether or not he should be discharged upon this petition for habeas corpus.

Any such re-trial must of course be before a jury from which Negroes have not been systematically excluded, or before some court or tribunal so constituted as not to violate his constitutional rights.

33. See also, Emspak v. United States, 1955, 349 U.S. 190, 198, 75 S.Ct. 687, 99 L.Ed. 997, and cases there cited.

34. Compare Pollock v. Williams, 1944, 322 U.S. 4, 16, 64 S.Ct. 792, 88 L.Ed. 1095; Moser v. United States, 1951, 341 U.S. 41, 47, 71 S.Ct. 553, 95 L.Ed. 729.

35. See Dowd v. United States ex rel.

Cook, 1951, 340 U.S. 206, 210, 71 S.Ct. 262, 95 L.Ed. 215; Mahler v. Eby, 1924, 264 U.S. 32, 46, 44 S.Ct. 283, 68 L.Ed. 549; United States ex rel. Sheffield v. Waller, D.C.W.D.La.1954, 126 F.Supp. 537, 546, certificate of probable cause denied 5 Cir., 1955, 224 F.2d 280; 28 U.S.C.A. § 2106; 28 U.S.C.A. § 2243, last sentence and footnotes 479 and 480.

For the guidance of the parties, the Court expresses the further present opinion that if the appellant is re-tried, and if any question should arise as to the legality or constitutionality of such trial, that should be decided not upon the present petition but in the regular course by the Courts of the State of Mississippi, subject to possible review by the Supreme Court of the United States.

The judgment of the District Court is reversed and judgment here rendered in accordance with the holdings of this opinion.

Reversed and rendered.

## Appendix

Summary of Extracts from Evidence in District Court on Issues of Systematic Exclusion of Negroes from Grand Jury and Petit Jury and on Whether Such Objections Were Waived.

Claude Hatcher,
called as a witness by the petitioner:

### Direct Examination

By Mr. Leighton.

"Q. Calling your attention to November, '54, what was your occupation? A. I was Circuit Clerk of Carroll County.

"Q. In that capacity, Mr. Hatcher, did you have anything to do with the preparation of the summoning to serve on the grand jury and petit jury of the citizens of Carroll County? A. I did.

\* \* \* \* \* \*

"Q. Mr. Hatcher, when you prepared the jury summons for the grand and petit jury panels in Carroll County for the November Term in 1954, did you summon any members of the Negro race to serve on either or both panels? A. I didn't summon any of them.

\* \* \* \* \* \*

"A. I issued the notices for the names of the jurors as given me by the judge of the court as drawn out of the jury box, which is our way of selecting a jury . . . .

\* \* \* \* \* \*

"Q. From your knowledge of the persons summoned, and from the official position you occupied in the issuance of processes for jury service, for both grand and petit juries, during the time you were clerk in Carroll County from 1940 to 1954, did you have occasion, and do you have any recollection of seeing any members of the Negro race on those panels? A. No.

### Cross Examination

By Mr. Patterson.

"Q. During that time that you were Circuit Clerk of your county, Mr. Hatcher, do you recall, or did you, as Circuit Clerk, or any other county public official, ever see any officials of Carroll County systematically, deliberately, and intentionally exclude members of the Negro race of your county from becoming qualified electors or from serving on a jury in your county? A. Not at all.

M. M. Bennett,
a witness called by the petitioner:

### Direct Examination

By Mr. Leighton.

\* \* \* \* \* \*

"A. \* \* \* I am Chancery Clerk of Carroll County, Mississippi, at Carrollton.

\* \* \* \* \* \*

"A. Since January of 1944.

\* \* \* \* \* \*

"Q. Mr. Bennett, during this period in which you served in an official capacity you told us about, and from the personal knowledge and information that you have obtained, does the list which you certified to the Clerk of the Circuit Court contain those persons eligible for jury service during this period you told us about, does that list contain, from your knowledge, any persons who are Negroes? A. None that I know of.

### Cross Examination

By Mr. Patterson.

"Q. Mr. Bennett, during the time that you have been Chancery Clerk, and as such, the Clerk of the Board of Supervisors of your county, and of course, with the Board at the time they are tak-

ing the names for jury duty, do you know of any act on the part of any member of the Board of Supervisors in selecting these names for jury service, do you know of any instance where any member of the Board of Supervisors of Carroll County has deliberately and willfully sought to find and exclude the names of Negroes in Carroll County from jury duty? A. No, sir, I do not.

Redirect Examination
By Mr. Leighton.
 * * * * * *

"Q. Now during that time, the same period of time, do you have an independent recollection of ever having registered in that district while you were a Deputy Circuit Clerk, any member of the Negro race as a registered voter? A. I have.

"Q. Well, could you tell us when it was? A. Sometime in '44 or '45, or maybe '46 or '47, somewhere along in there.

"Q. Can you recall who that person was? A. Well, I've listed several of them. I can't recall just who they all are, but I can recall several of them. Mose Hemmingway, for one, and Wes Jones was another.

"Q. In what district was that? A. District four.

"Q. And they still live there? A. No, they are dead. Both of them.
 * * * * * *

"Q. Do you think both of them died before 1954, if you know? A. I think so.

H. E. Ashmore,
a witness called by the petitioner:

Direct Examination
·By Mr. Leighton.
 * * * * *· *

"Q. Mr. Ashmore, I call to your attention the date of November of '54, were you Sheriff of Carroll County at that time? A. Yes, sir.

"Q. How long had you been Sheriff in 1954? A. About two years.

"Q. When did your term of office expire? A. In 1956.

"Q. During that period of time, Mr. Ashmore, did your duties as Sheriff include the service of processes on citizens in Carroll County called for grand and petit jury service? A. Yes.

"Q. Did you, during the time you were Sheriff, if you can recall, serve any processes or summons issued by the Clerk of the Circuit Court of Carroll County for jury service, either grand or petit jury, to any person of the Negro race? A. Well, now that's a little difficult question. I wouldn't say that a man probably had Negro blood in him, because we have summoned dark complected people and white complected people, so I wouldn't say whether a man was or was not a negro.

"Q. You couldn't tell? A. I couldn't tell whether he was a full blooded white man or not.

"Q. Well, I was asking you a question, has any person indicated to you that they were members of the Negro race whom you have served any processes on? A. I don't recall any being served on a real black Negro.
 * * * * * *

"Q. Mr. Ashmore, during the time that you were Sheriff of Carroll County, did your duties include the collecting of taxes? A. Yes.

"Q. And you collected taxes from all the taxpayers in Carroll County? A. Yes.

"Q. Do you have any recollection of having collected taxes from persons of the Negro race? A. We collect taxes from Negroes and Whites, too.

Cross Examination
By Mr. Patterson.
 * * * * * *

"Q. Do you ever recall any instance of the summoning of jurors wherein members of the Negro race were systematically, willfully and deliberately excluded from being summoned as jurors? A. No, sir.

George W. Turbeville, Jr.,
a witness called by petitioner:

Direct Examination

By Mr. Leighton.

\* \* \* \* \*

"A. \* \* \* I live in Vaiden, Mississippi, and am Chancery Court Clerk of Carroll County, Mississippi.

\* \* \* \* \* \*

"A. Since the first of 1956.

\* \* \* \* \* \*

"Q. And you received a subpoena duces tecum for this hearing, did you not? A. That's right.

"Q. And that subpoena asked for the jury list for the years 1952, '53, '54, '55, '56, and '57, did it not? A. That's right.

\* \* \* \* \* \*

"Q. Mr. Turbeville, from your knowledge acquired while Circuit Clerk of Carroll County, do you know if this list includes any members of the Negro race? A. I do not.

Cross Examination

By Mr. Patterson.

"Q. Do you know that it does not include any members of the Negro race? A. I do not.

J. T. Allen,
a witness called by the petitioner:

Direct Examination

\* \* \* \* \* \*

"A. I am Sheriff of Carroll County.

"Q. How long have you been Sheriff of Carroll County, sir? A. Well, this time I'm in the third year.

"Q. I take it that you had served as Sheriff of Carroll County prior to this time, sir? A. I have.

"Q. When was that, sir? A. Well, at various times in the 30 years I have been connected with the Sheriff's office, for better than 20 years of that 30.

"Q. Well, during that period that you have served as Sheriff, and prior to the last day of November, 1954, Mr. Allen, have you ever issued any processes or summons or notice to a member of the Negro race for jury service? A. Well, I don't know exactly whether I have or not.

"Q. And why would that be, sir? A. Well, because I don't know whether they had Negro blood in them or not.

\* \* \* \* \* \*

"Q. Now Mr. Allen, let me ask you this, if during the time that you served as Sheriff, prior to 1954 up to the last day of November, 1954, do you have an independent recollection of ever having served a process or notice or summons for jury duty to any citizen of Carroll County that you knew was a member of the Negro race? A. Well, no, not that I know of.

Cross Examination

By Mr. Patterson.

"Q. Mr. Allen, I believe you have been Sheriff of your county some five times, isn't that correct? A. Well, somewhere along there.

\* \* \* \* \* \*

"Q. Mr. Allen, during that period of time, a period of 20 years that you have served as Sheriff of Carroll County, or as a deputy sheriff of your county, do you recall any instance or occasion where members of the Negro race of your county were systematically, deliberately, and willfully excluded from being called to jury duty in your county? A. No, sir.

John E. Aldridge,
a witness called by the petitioner:

Direct Examination

By Mr. Leighton.

\* \* \* \* \* \*

"A. John E. Aldridge, Winona, Mississippi, and I am District Attorney for the Fifth Judicial District of Mississippi.

\* \* \* \* \* \*

"A. Since November 12, 1950.

"Q. Your duties, Mr. Aldridge, include the handling of trials before juries, do they not? A. They do, presenting the State's case.

"Q. And you, during that time, presented the cases to the grand jury? A. I did.

"Q. Mr. Aldridge, during the time that you were a district attorney, and

prior to the November Term of 1954 Circuit Court, and including the November Term of 1954, did you ever present a case to the grand jury of Carroll County, Mississippi, in which there was a member of the Negro race, who was known to be a Negro? A. I couldn't say. There are certain counties in the district that I am not personally acquainted with nearly all of the men.

"Q. I had reference, sir, in my question to those juries that you presented cases to, and in the instances when you had occasion to observe the composition of the grand jury, could you tell us whether or not at any time during the years in which you served as district attorney, when you presented a case or cases to the grand jury, did you ever present a case to the grand jury that included a person you knew to be a Negro? A. I wouldn't know.

* * * * * *

"Q. Mr. Aldridge, calling your attention to the judicial district in which you served, and that portion of the judicial district, including the Second District of Carroll County, Mississippi, including the town of Vaiden, Mississippi, have you at any time during the time that you served as District Attorney, presented a case to a petit jury of that particular district on which there was serving a member of the jury known to be a member of the Negro race? A. I wouldn't know. I don't know what race the jurors belonged to.

Cross Examination
By Mr. Patterson.

"Q. Under our procedure, Mr. District Attorney, does the district attorney have anything at all to do with the summoning of jurors and who they might be? A. Not a thing in the world.

Frank I. Lovell, Jr.,
being called as a witness by the petitioner:

Direct Examination
By Mr. Leighton.

* * * * * *

"A. * * * I am Superintendent of Education in Carroll County.

* * * * * *

"A. Since January of 1952.

"Q. Now between the time you first began the duties of superintendent of public education of Carroll County, Mississippi, and the year 1954, particularly the last day of November, 1954, did your duties include supervision of the schools of members of the Negro race in Carroll County? A. Yes, sir.

"Q. And from your knowledge, does Carroll County have a system of education for Negroes, including high schools? A. Yes, sir.

* * * * * *

"Q. Did you have any members of the Negro race who attended the high schools of Carroll County under your supervision, prior to 1954? A. Yes.

"Q. And during the period 1952 to 1954, were members of the Negro race graduated from the high schools of Carroll County Mississippi? A. Yes.

* * * * * *

"Q. Do you have an independent knowledge, sir, of how many Negroes graduated from the high schools of Carroll County in 1954 while you were supervising those schools? A. Without my records I couldn't tell you, no sir.

"Q. But you would say there were such graduates? A. Oh, yes.

"Q. Were they in the neighborhood of two or three hundred? A. No.

"Q. A smaller number? A. Yes.

"Q. How many would you say? A. It would be less than 50.

Willie Burkhead,
a witness called by the petitioner:

Direct Examination
By Mr. Leighton.

"Q. Will you state your name, address and occupation? A. Willie Burkhead, Vaiden, Mississippi. I farm.

"Q. How long have you lived in Carroll County, Mississippi, Mr. Burkhead? A. All my life.

"Q. Do you own property in Carroll County, Mississippi? A. I do.

"Q. And do you pay poll taxes in Carroll County? A. I do.

"Q. Do you attend public schools in Carroll County—I mean did you attend public schools? A. I did.

"Q. Are you registered to vote in Carroll County? A. I am not.

"Q. Have you ever applied, prior to November of 1954, to register as a voter in Carroll County, Mississippi? A. Yes, sir, once.

\* \* \* \* \* \*

"A. \* \* \* I don't remember whether it was more than once or not.

"Q. Just for the record, Mr. Burkhead, you are a member of the Negro race, are you not? A. I am.

"Q. Now, Mr. Burkhead, are you at this time a registered voter in Carroll County? A. I am not.

"Q. Why aren't you a registered voter in Carroll County? A. I never did register.

"Q. Did you ever try to register? A. I did. I asked the clerk if he had any objections, and he said personally he didn't, but there was some kind of a law that they had in Mississippi at that time that wasn't allowing anyone to register.

\* \* \* \* \* \*

## Cross Examination

By Mr. Patterson.

"Q. Did I understand you to say that you went to the clerk of Carroll County and sought to register? A. Yes, sir, I asked him if he had any objections.

"Q. Did he tell you that you couldn't register? A. He said personally he didn't mind, that he had no objections, but at that time there was some kind of a law that was on in Mississippi that was not allowing anyone to register.

\* \* \* \* \* \*

"Q. He didn't tell you that you couldn't register, did he? A. No, sir.

"Q. And he didn't tell you that you could not return to that office at some future date and register, did he? A. No, sir.

"Q. And you haven't returned and sought to register since that time, have you? A. No, sir.

\* \* \* \* \* \*

## Redirect Examination

By Mr. Leighton.

\* \* \* \* \* \*

"Q. Had you paid your poll tax prior to this occasion? A. Well, I've been paying poll tax a good many years. First they started writing it on the regular tax receipt, then a few years after that, why they give you a receipt and then they stopped that. It was in '53 or '54, I think it was, and then they gave me a slip.

\* \* \* \* \* \*

## Roy Robertson,

a witness called by the Petitioner:

## Direct Examination

By Mr. Leighton.

"Q. Please state your name, address and occupation. A. Roy Robertson, and I am farming.

"Q. Where do you live, sir? A. Coila, Mississippi.

"Q. How long have you lived in Coila, sir? A. 57 years.

"Q. That is in Carroll County, Mississippi, is it not? A. Yes, sir.

"Q. For the record, Mr. Robertson, you are a member of the Negro race? A. Yes, sir.

"Q. Did you go to school in Carroll County, Mississippi? A. Yes, sir.

"Q. Do you own property in Carroll County? A. Yes, sir.

"Q. Are you registered to vote in Carroll County? A. No, sir.

"Q. Why aren't you registered to vote in Carroll County, Mississippi? A. Well, I haven't tried to.

\* \* \* \* \* \*

"Q. Do you know of any members of the Negro race who registered to vote in Carroll County? A. I do not.

\* \* \* \* \* \*

John Smith,
a witness called by the Petitioner:

By Mr. Leighton.

"Q. Please state your name, address and occupation, sir. A. My name is John H. Smith. I live in Coila, Mississippi, and I am a farmer.

"Q. How long have you lived in Carroll County? A. All my life, 57 years.

"Q. I take it that you attended the public schools in Carroll County? A. Yes, sir.

"Q. Do you own any property in Carroll County? A. Yes, sir.

"Q. Are you registered to vote in Carroll County? A. No, sir.

"Q. To your knowledge, do you know of any member of the Negro race in Carroll County who owns property and pays taxes, including poll taxes, who is registered to vote, and who was registered to vote prior to November of 1954? A. No, sir.

\* \* \* \* \* \*

Robert Lee Goldsby,
the petitioner:

Direct Examination

By Mr. Leighton.

\* \* \* \* \* \*

"Q. And you are the petitioner in this case, are you not? A. That's right.

"Q. Where were you born, Robert? A. In Canton, Mississippi.

"Q. Calling your attention to November of 1954, how old were you? A. 28, I think it was.

\* \* \* \* \* \*

"Q. And prior to November of 1954, had you ever been arrested for any crime other than the one with which you are now concerned? A. No, sir.

"Q. Where were you living in September of 1954, Robert? A. In St. Louis.

\* \* \* \* \* \*

"Q. Did you have any kin folk friends or acquaintances in Carroll County, Mississippi? A. Not to my knowledge.

"Q. Do you recall being arrested on or about Labor Day, 1954? A. I do.

"Q. Where was that? A. Right out of Lexington, Mississippi.

"Q. And up to that time, had you ever been the subject of any indictment for any felony? A. I never had.

"Q. Did you have any kin folks in the State of Mississippi? A. I did.

\* \* \* \* \* \* \*

"Q. Do you recall being in Vaiden on November 8, 1954? A. I don't know exactly what date it was.

"Q. Well, to refresh your memory then, Robert, do you remember the day that you saw me in Vaiden, Mississippi? A. I remember the day that I saw you, but I don't remember the date.

"Q. What was that now? A. I say that I remember the day of the week I saw you, but I don't know what the date was.

\* \* \* \* \* \*

"Q. Do you recall what you did that day before the Court when I was there in Vaiden?

\* \* \* \* \* \*

"A. The Judge asked did I plead guilty to the charge, and—or did I plead not guilty, and I did.

"Q. Prior to that time, Robert, had you had a conference or conversation with me? A. No, sir, I hadn't.

\* \* \* \* \* \*

"Q. Where was it in that building that you did see me? A. Well, it was the first that I can recollect, now let's see, the first time I seen you we was standing before the Judge putting in a plea of guilty or not guilty.

"Q. Did you and I have ay conversation on that occasion before or after? A. No, sir, we didn't.

\* \* \* \* \* \*

"Q. Did you, at any time near the moment when you appeared before the Judge, understand what I was doing there? A. After seeing you?

."Q. Yes. A. Well, I had an understanding that probably you would be my attorney.

\* \* \* \* \* \*

"Q. Did you, at that time, Robert, calling your attention to November 8, 1954, and before your trial, did you know anything about the provisions of our Federal Constitution and the rights you had under that Constitution? A. I had no knowledge of any sort connected with the courts.

\* \* \* \* \* \*

"Q. Did you, at any time between the date that you were in Vaiden, Mississippi, the date that you saw me, and the time that you were brought to trial, have a conversation or talk with anybody, either a member of your family or any other person, about the rights that you had as a prisoner in the state of Mississippi? A. None whatsoever.

"Q. Did you get to know an attorney named Mr. John W. Pruitt? A. I did.

"Q. When did you first see Mr. Pruitt? A. The day of the paneling of the grand jury, I think I did. I think that was the first time, it was the day of the pounding of the grand jury, I believe they called it, instead of paneling.

\* \* \* \* \* \*

"Q. Now Robert, when did you first learn, or get the idea that day you were in Vaiden, that Mr. Pruitt was there, and a grand jury, where did you get that idea? A. Well, from the talk that was going on in the Courtroom.

"Q. That is how you understood it? A. Yes, sir.

"Q. Now do you recall sitting there and going to trial before this jury? A. I do.

"Q. Now prior to the time you went to trial before this jury, had you seen Mr. Pruitt and talked to him? A. I had not.

"Q. Did you see any other attorney in court who was participating in your defense? A. Yes, sir, there was another attorney there, but I can't think of his name.

"Q. Did you talk with him prior to this trial? A. Prior to the trial, I did not.

"Q. Well, did you talk with him at any time during the trial? A. Once or twice when we was in a little room together, one day with him, I talked with him about my case.

"Q. Did either one of these two attorneys tell you at any time that you had the right to question who would be on that jury? A. They did not.

"Q. Did you at that time, Robert, know that you had a right to question the fact that there were no members of your race on that jury? A. I didn't know that.

"Q. Did anyone of those attorneys tell you that? A. They did not.

"Q. Robert, how far did you go to school in Mississippi? A. To the fifth or sixth grade.

\* \* \* · \* \* \*

"Q. Now Robert, did anyone at any time tell you of the reason why there had been a change of attorneys in your case prior to the time you went to trial? A. I didn't know there had been a change until I come to trial.

Cross Examination

By Mr. Patterson.

"Q. Robert, I believe you said that you were 28 years of age at the time you were tried in Carroll County? A. Yes, sir.

\* \* \* \* \* \*

"Q. I believe you say you went to the fifth or sixth grade in school in Mississippi? A. Yes, sir.

\* \* \* \* \* \*

"Q. Now you were in the service as a soldier, weren't you? A. I was.

"Q. What branch of the service were you in, Robert? A. The Engineers.

\* \* \* \* \* \*

"Q. What were your duties as a soldier while you were in service? A. I was an auto mechanic.

\* \* \* \* \* \*

"Q. And you had a high rating as that, didn't you? A. Yes, sir, I did.

"Q. What rank did you have as a soldier? A. T-5.

"Q. And how long were you in the service? A. I was in the service six years, altogether.

\* \* \* \* \* \*

"Q. And when were you then released from service? A. In 1951.

\* \* \* \* \* \*

"Q. And what were you doing in St. Louis? A. When?

"Q. Prior to your coming to Mississippi at the time this happened? A. Well, at the time this happened, I was working at a shoe factory.

"Q. What were you doing in that factory? A. I was a lathe operator, I was a lather.

"Q. Did you ever go to school under the G.I. bill? A. I did.

\* \* \* \* \* \*

"Q. How long did you go under that bill? A. I finished high school.

\* \* \* \* \* \*

"Q. And that was immediately prior to the happening of this instance in Carroll County, Mississippi? A. Yes, sir.

\* \* \* \* \* \*

"Q. Were you ever, at any time, denied the right to have members of your family or your attorneys come to see you? A. Well, I know when I was in Jackson, I didn't have anyone come to see me, they didn't nobody come to see me until after my mother died, and I got out of Jackson and was taken to Louisville, but as to whether they objected to any of my folks coming to see me, I wouldn't know.

"Q. Did you ask to see an attorney? A. No, sir.

\* \* \* \* \* \*

"Q. But where did you first come in contact with Attorney Leighton? A. I come in contact with Attorney Leighton when I was standing before the Judge to make my plea of guilty or not guilty.

\* · \* \* \* \* \*

"Q. And didn't you have a conference with your attorney, Mr. Leighton, later on, and then you were in a room by yourselves, and that was before you came back in and the district attorney read the indictment to you and asked whether you pleaded guilty or not guilty, isn't that right? A. No, sir, I didn't have any conversation with him at all.

"Q. You never had any conversation with your attorney? A. When I was there in the courtroom, that's all.

\* \* \* \* \* \*

"Q. Do you mean to tell the Court that you cannot remember whether or not you ever had a conference or a conversation with Attorney Leighton there at the Courthouse at Vaiden, Mississippi? A. I can tell the Court I remember seeing him, but to give an honest opinion, I would not say I did or did not, because I wouldn't know.

"Q. Did Attorney Leighton tell you at the time that he was with you, did he ever tell you of your Constitutional rights in the proceeding in this trial? A. No, sir, he did not.

\* \* \* \* \* \*

"Q. And when you proceeded to trial, you were represented by Mr. John W. Pruitt of Vicksburg and Mr. Rupert Ringgold of Winona, Weren't you? A. I was.

"Q. And your own family employed Mr. Pruitt, didn't they? A. I imagine they did.

\* \* \* \* \* \*

"Q. Would you tell this Court that Mr. Pruitt and Mr. Ringgold didn't conduct a trial there in your behalf, and do for you everything that two first class lawyers could possibly do for their client in a courtroom, charged with the crime with which you were being tried? A. I couldn't give you an account of that. I couldn't say yes or no, for I don't know.

\* \* \* \* \* \*

"Q. During the course of that trial, did you make any request of your attorneys that they refused to comply with? A. I made no requests whatsoever to my attorneys.

Mr. Leighton.

What was that answer? I didn't hear it.

The Witness.

I said I made no requests whatsoever to my attorneys because I didn't know of any to make.

"Q. During the time that you were in the Louisville jail, you were treated properly, were you not? A. I was.

\* \* \* \* \* \*

The Court.

How many times did you talk with your lawyers when just you and your lawyers were in a room by yourselves, or with your witnesses who were there to testify for you, when they were present?

The Witness.

I think twice, I imagine, I wouldn't be sure of that.

The Court.

No more than that?

The Witness.

Well, it could have been a little more, but I wouldn't be sure. I said twice, I know I wouldn't be too far wrong.

Redirect Examination

By Mr. Leighton.

"Q. On these occasions, Robert, that you remember having talked with your counsel at the trial, were these on the day of the trial or before? A. One of them was before the trial, that was the day they was getting a jury.

\* \* \* \* \* \*

De Willie Goldsby,
a witness called by the petitioner:

Direct Examination

By Mr. Leighton.

"Q. Please state your name, address and occupation? A. De Willie Goldsby, 1208 Carter, Pascagoula, Mississippi. \* \* \* I work in the shipyards there.

"Q. You are a brother of Robert Lee Goldsby, the petitioner here, are you not? A. Yes, sir.

\* \* \* \* \* \*

"Q. What was the occasion of your being in Vicksburg, Mississippi? A. I went over there, me and my auntie, to see about getting some money from the bank there on our home, and she told them that we had to get a lawyer, so the man at the bank, he made up the deed on the place, and so she started and decided that she would go see her lawyer, that was Lawyer Pruitt.

\* \* \* \* \* \*

"Q. Mr. Goldsby, in this conversation with Mr. Pruitt, was there any reference to the status of the lawyer representing your brother? A. Yes, sir. I told him about who I had, and I asked him would it be all right, and that's the lawyer that they want, and I said "Could you work with him".

"Q. What was said about that? A. He told me no, he could not work with him at all.

\* \* \* \* \* \*

"Q. Was there any mention to Mr. Pruitt about the race of the lawyer that was in the case at that time? A. Yes, sir, it was.

"Q. How did that question arise as to the race of that lawyer; how did that come into the conference? A. He said it wouldn't look right, and then he asked me how would I feel having a Negro lawyer from Chicago on a case like that down in Vaiden, Mississippi.

Mr. Patterson.

We object to that for the same reason, if the Court please.

The Court.

That objection is sustained as to the last answer of the witness. The witness' answer to that question will not be considered by the Court in passing on the matter.

\* \* \* \* \* \*

Cross Examination.

By Mr. Patterson.

\* \* \* \* \* \*

"Q. Mr. Pruitt was your aunt's regular attorney? A. Yes, sir.

\* \* \* \* \* \*

"Q. I said Mr. John Pruitt, that attorney of Vicksburg, was employed to go to Vaiden and represent your brother? A. Yes, sir, he was.

Mrs. Alice Admon,
a witness called by the petitioner:

Direct Examination

By Mr. Leighton.

"Q. Would you please give us your name and address? A. Alice Admon, Vicksburg, Mississippi.

\* \* \* \* \* \*

"Q. I believe you are the aunt of Robert Lee Goldsby? A. Yes, sir.

\* \* \* \* \* \*

"Q. Mr. Pruitt was your attorney at that time? A. Yes, sir.

\* \* \* \* \* \*

Cross Examination

By Mr. Patterson.

"Q. Your home is in Vicksburg, I believe? A. Yes, sir.

\* \* \* \* \* \*

"Q. And you knew for a fact that Mr. Pruitt is recognized and considered one of the best attorneys in Vicksburg, you knew that, didn't you, you live in Vicksburg, and you knew that he was an outstanding lawyer handling criminal cases in Vicksburg, didn't you? A. Yes, sir.

\* \* \* \* \* \*

"Q. Well, without going into the details of this conversation, you did employ him to go to Vaiden and defend your nephew, did you not? A. Yes, sir.

"Q. And you paid him a fee to do that? A. Yes, sir.

\* \* \* \* \* \*

Mr. Leighton.

May I ask the Court Reporter just prior to the closing of the petitioner's proof, to mark as Exhibit 1 and 1-A, the exhibit which is Page 2 of the proceedings before the United States Senate on June 10, 1957.

\* \* \* \* \* \*

The Court.

Well, you can get it in the record here to make up your record in this case, and you may offer it, but the exhibit is rejected. The record will show that it was offered and is marked as a rejected exhibit.

\* \* \* \* \* .* \*

Mr. Leighton.

Now Your Honor, the second exhibit is Page 29 through 40 of the Census of the United States, of the State of Mississippi. \* \* \*

\* \* \* \* \* \*

The Court.

That objection is overruled, the Court being of the opinion that, of course, the Court probably will take judicial notice that it will be received in evidence for what it is worth.

\* \* \* \* \* \*

Mr. Leighton.

We ask the Court for authority for the petitioner to serve notice of the taking of depositions of certain witnesses in Chicago, and that these depositions be taken in the District Court for the Northern District of Illinois in Room 263 of the Courthouse of the District Court for the Northern District of Illinois by Mr. Alfred H. Fredericks, Official Court Reporter for the Northern District of Illinois— \* \* \*

\* \* \* \* \* \*

The Court.

You may file your motion and get it in the record. I will reserve ruling on it now, and if this closes your case, we will proceed with the Respondent's proof.

Henry L. Rogers,
a witness called by the Respondent:

Direct Examination

By Mr. Patterson.

"Q. State your name and place of residence, please. A. Henry Rogers. I am a resident of Louisville, Mississippi.

"Q. What official position do you hold in Mississippi at this time, Judge? A. I am Circuit Judge for the Fifth Circuit District.

Q. How long have you been Circuit Judge of your district? A. Well, this is the 8th year.

\* \* \* \* \* \*

"Q. Judge Rogers, were you the presiding judge in the case of the State of Mississippi against Robert Lee Goldsby? A. I was, sir.

\* \* \* \* \*

"Q. Do you recall Attorney George Leighton appearing in your court as representing this defendant? A. Yes, sir.

\* \* \* \* \* \*

"Q. Judge, at the time you suggested that he confer with his client, and you offered to clear out a room for him, did he ask if he was permitted to confer with his client down here? A. Yes, and I told him he certainly was, and to take his client to the room that I had prepared for him, which he did, and they were in that room some 25 minutes before the defendant was arraigned.

"Q. Did Attorney Leighton indicate what his motion was, or what the motions, I believe you said that he mentioned filing some motions; did he ever indicate what those motions were going to be? A. Well, my answer is simply an impression that I got from him. I got the impression what his motion would be, and I recall telling him that I had a brief on what I thought his motion was at the time.

\* \* \* \* \* \*

"Q. And so you gave him until Wednesday to prepare and present those motions? A. Yes, sir.

"Q. Did I understand you to say that you had a brief there on what you anticipated the motion to be, and that you stated to him that if he submitted that motion and had proof to support the motion, that you would certainly sustain it? A. That is what I told him.

\* \* \* \* \* \*

"Q. You did not appoint the other counsel who appeared later in the case in behalf of the defendant? A. Mr. Ringgold had a conference with the defendant while he was there, and after he had taken him into a room alone, I suppose that he talked with the defendant and his relatives who were present, and on Wednesday morning, when the case was

called, Mr. Pruitt showed up, and that was my first knowledge of Mr. Pruitt's connection with the case when he appeared and announced that the Goldsby people, maybe the defendant's mother, I don't know who, had employed him to assist in the trial, and I asked Mr. Ringgold if Mr. Pruitt could not be joined in the appointment that I had made of him, and he said that would be all right, so I put both names in the record as representing the defendant.

\* \* \* \* \* \*

"Q. I would like for you to state whether, in the trial of this particular case, and observing the trial as you naturally did, was there anything in the conduct of the trial about the method of the defense of this petitioner here, that would have led you, or anyone else, to believe that he was not being ably represented by his counsel? A. No, sir; he certainly was ably represented, and I think the record will show that Mr. Pruitt and Mr. Ringgold made a wonderful showing.

\* \* \* \* \* \*

"Q. There was no occasion, or there was no indication at any time that they were just putting up a token defense of this defendant? A. No, sir, they put up a very good defense, if I may say so.

\* \* \* \* \* \*

"Q. Now in the matter of the drawing of the jury in your court, state whether or not at any time you, as judge, have ever directed that in the selection of jurors for Carroll County, or any other county in your district, but particularly Carroll County, has there been any difference made in the selection of the white or colored jurors, or any kind of exclusion of colored jurors? A. No, sir.

\* \* \* \* \* \*

Cross Examination.

By Mr. Leighton.

"Q. So since 1951 you have been the judge in that Fifth District? A. Yes, sir.

"Q. During the time you have been a District Judge and presiding over jury

trials, have you ever seen on a jury of twelve men a person known to be a Negro? A. Well, that is relative. It is not known to me. I wouldn't know. A man is largely what he says he is, and we have a number of Choctaws in this part of the country, and we have some Cherokees, both tribes of Indians have a good many people living in this area.

"Q. But as far as you know, Judge Rogers, just from what you could tell by looking at prospective jurors, have you ever known a juror of the twelve men to be a Negro? A. Well, I've never seen that I can recall a man of the look of the defendant, a man with a long jaw, kinky hair, and black complexion, but I have seen men darker than you are.

"Q. Now those men that you say you have seen who are darker than I am, were they members of the Negro race? A. I just don't know about that; I don't know, because a man is largely what he says he is and what people say he is, and I know people say they are white, and I have heard they were Negroes, and vice versa.

Now as to knowing about that, I don't.

"Q. Well, with regard to the motion filed, were any of those motions a motion to quash the indictment because of the exclusion of Negroes from the jury? A. No, sir; had such a motion been made and proved, that would have been sustained.

* * * * * *

John E. Aldridge,
a witness called by the Respondent:

Direct Examination
By Mr. Patterson.

* * * * * *

"Q. What official position do you hold in the State of Mississippi? A. I am District Attorney for the Fifth Judicial District.

"Q. How long have you been District Attorney? A. Since November of 1950.

"Q. And this is the same Mr. Aldridge who testified before?

The Court.

Go ahead with your questioning. We understand this is the same witness.

* * * * * *

"Q. Do you recall whether or not Mr. Leighton was afforded an opportunity to confer with his client? A. Yes, he was afforded every opportunity. The Court cleared out a room and gave him that room for conferences with his client.

* * * * * *

"Q. Mr. Aldridge, in the course of that trial, would you say as an attorney, with vast experience in the trial of criminal cases, state whether or not Mr. Pruitt and Mr. Ringgold offered an able defense of this defendant throughout the trial? A. I have known of Mr. Pruitt up to that time; however, I had never been in a trial with him, but I found he was one of the most able adversaries and counsellors that I had been in court with, and he undoubtedly was a very able lawyer, and he and Mr. Ringgold fought hard throughout this trial.