**Brooks Lee ANDERSON, Petitioner-Appellant,**

v.

**Wilburn C. JOHNSON, Warden, Tennessee State Penitentiary, Respondent-Appellee.**

**No. 16533.**

United States Court of Appeals
Sixth Circuit.

Dec. 22, 1966.

J. Brad Reed, Nashville, Tenn. (Court appointed), for appellant, J. O. Bass, Jr., Nashville, Tenn. (Court appointed), on brief.

Ed R. Davies, Special Counsel, Nashville, Tenn., for appellees, Henry C. Foutch, Asst. Atty. Gen., State of Tennessee, Nashville, Tenn., on brief, George F. McCanless, Atty. Gen., and Reporter, State of Tennessee, Nashville, Tenn., of counsel.

Before PHILLIPS, Circuit Judge, and McALLISTER and CECIL, Senior Circuit Judges.

HARRY PHILLIPS, Circuit Judge.

This is an appeal from the order of the district court denying appellant's petition for a writ of habeas corpus.

Appellant, a Negro, was tried in the Circuit Court of Maury County, Tennessee, in 1949, under an indictment charging him with the crime of rape of a girl under fifteen years of age. The jury returned a verdict of guilty and fixed his sentence at forty-nine years and one day. Details as to appellant's previous criminal record and his personal history are set forth in the dissenting opinion of Judge McAllister.

In his trial in the State court appellant was represented by Mr. Pride Tomlinson, Jr., a leading member of the Maury County Bar, as court-appointed counsel. This attorney filed a motion for a new trial, which later was dismissed on appellant's own application made in open court. Appellant is now serving his sentence in the Tennessee Penitentiary.

The District Judge, the Honorable William E. Miller, conducted a thorough evidentiary hearing in the habeas corpus proceeding. Appellant was represented capably in the district court by Mr. Kent Sandidge, III, of the Nashville Bar as court-appointed counsel. Prior to the hearing in this court Mr. Sandidge had been appointed Assistant United States Attorney and was permitted to withdraw as counsel for appellant. Thereupon, this court appointed Mr. James O. Bass, Jr., and Mr. J. Brad Reed of the Nashville Bar as counsel for appellant. These attorneys have filed a comprehensive brief and made an able oral argument before this court.

Two questions are raised on this appeal: (1) that a confession was elicited from appellant subsequent to his arrest and before indictment, after his request to see a lawyer had been denied, relying upon Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; and (2) that Negroes were systematically excluded because of their race from the grand jury which indicted appellant and from the petit jury which convicted him, in violation of his rights under the equal protection clause of the Fourteenth Amendment.

### I.

■ Appellant previously filed a habeas corpus proceeding in the State courts, but did not raise the *Escobedo* question in that proceeding. This issue was presented for the first time in the district court in the present case. The district judge correctly ruled that appellant has failed to exhaust his State remedies and that the district court would not consider his claim for relief based on that issue. 28 U.S.C. § 2254.

■■ It is now settled that neither Escobedo v. State of Illinois, supra, nor Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, would apply retroactively to this case,

which was tried in 1949. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. Further, since appellant's contention is premised upon a denial of his right to counsel, and no question is made in this court as to the voluntariness of his confession, Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895, is not applicable.

We accordingly hold that no relief on the issue of denial of the right to counsel is available to appellant in this case.

## II.

Both the grand jury which indicted appellant and the petit jury which returned a guilty verdict against him were composed entirely of members of the white race. We now turn to the contention that Negroes were excluded systematically from the grand jury and the petit jury, in contravention of appellant's rights under the Fourteenth Amendment. This contention is based upon a principle of constitutional law long since firmly established. Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664.

In Carter v. State of Texas, 177 U.S. 442, 447, 20 S.Ct. 687, 690, 44 L.Ed. 839, the Supreme Court said:

"Whenever by any action of a State, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States. Strauder v. West Virginia, 100 U.S. 303 [25 L.Ed.2d 664]; Neal v. [State of] Delaware, 103 U.S. 370, 397 [26 L.Ed. 567, 574]; Gibson v. [State of] Mississippi, 162 U.S. 565 [16 S.Ct. 904, 40 L.Ed. 1075]."

In Norris v. State of Alabama, 294 U.S. 587, 589, 55 S.Ct. 579, 580, 79 L.Ed. 1074, the court said:

"[A]lthough the state statute defining the qualifications of jurors may be fair on its face, the constitutional provision affords protection against action of the state through its administrative officers in effecting the prohibited discrimination."

■ The "rule of exclusion" has been applied to prohibit discrimination against any delineated class. Hernandez v. State of Texas, 347 U.S. 475, 480, 74 S.Ct. 667, 98 L.Ed. 866. Briefly stated, the rule is: proof that Negroes constitute a substantial segment of the population of the jurisdiction, that some Negroes are qualified to serve as jurors, and that none of them have been called for jury service over an extended period of time establishes a prima facie case of systematic exclusion of Negroes from jury service. Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579; Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Hill v. State of Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559; Cassell v. State of Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; Ross v. State of Texas, 341 U.S. 918, 71 S.Ct. 742, 95 L.Ed. 1352; Labat v. Bennett, 365 F.2d 698 (C.A.5).

■ It is equally well settled that a member of a racial group has no constitutional right to be tried by a jury composed proportionately of members of his own race. In Swain v. State of Alabama, 380 U.S. 202, 208, 85 S.Ct. 825, 829, 13 L.Ed.2d 759, the Court said:

"[A] defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. [State of] Virginia v. Rives, 100 U.S. 313, 322–323 [25 L. Ed. 667]; Gibson v. [State of] Mississippi, 162 U.S. 565 [16 S.Ct. 904]; Thomas v. [State of] Texas, 212 U.S. 278, 282 [29 S.Ct. 393, 53 L.Ed. 512]; Cassell v. [State of] Texas, 339 U.S. 282 [70 S.Ct. 629]. Neither the jury roll nor the venire need be a perfect mirror of the community or accurately

reflect the proportionate strength of every identifiable group. 'Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race and no discrimination because of color, proportional limitation is not permissible.' Cassell v. [State of] Texas, 339 U.S. 282, 286–287 [70 S.Ct. 629] (opinion of Mr. Justice Reed, announcing judgment)."

In Thomas v. State of Texas, 212 U.S. 278, 282, 29 S.Ct. 393, 394, the Court stated that:

"It was ruled in Martin v. [State of] Texas, 200 U.S. 316 [26 S.Ct. 338, 50 L.Ed. 497], as in other cases, that discrimination in organizing a grand jury and impanelling a petit jury cannot be established by merely proving that no one of the defendant's race was on either of the juries, and that an accused person cannot of right demand a mixed jury, some of which shall be of his race, nor is a jury of that kind guaranteed by the 14th Amendment to any race. And it was said 'What an accused is entitled to demand, under the Constitution of the United States, is that, in organizing the grand jury, as well as in the impanelling of the petit jury, there shall be no exclusion of his race, and no discrimination against them, because of their race or color.' "

District Judge Miller made a finding of fact that there was no purposeful exclusion of qualified Negroes from the grand and petit juries in Maury County, Tennessee, in 1949, including the following:

"Petitioner has failed to establish a prima facie case of purposeful discrimination or exclusion of qualified negroes from the grand and petit juries of Maury County during 1949. Petitioner introduced census reports which purported to establish that the population of Maury County during the period in question was twenty-five per cent negro. He then introduced testimony of several witnesses who said that they were unable to recall that any negroes had served on the grand or petit juries during that time. They further testified that there were qualified negroes living in the county at that time. (It is to be noted that one of the witnesses who testified that there were qualified negroes who could have served on the jury did not even know what the qualifications for jury duty were.)

"In order to establish sufficient ground for relief, it must be shown that there was a purpose to discriminate. Mere racial imbalance will not suffice. Akins v. Texas, 325 U.S. 398 [65 S.Ct. 1276, 89 L.Ed. 1692]. While petitioner introduced evidence as to the percentage of negro population in Maury County in 1949, he did not establish with any certainty what proportion of the negro population would qualify for jury duty. Against the testimony of the individuals who were unable to recall any negroes serving on the juries during the period in question, defendant has offered the highly credible testimony of three participants in the 1949 trial, including the trial judge, the Honorable Joe M. Ingram. Pride Tomlinson, Jr., who served as petitioner's attorney, and Attorney General Paul Bumpus both testified that during 1949 negroes were in fact subpoenaed for jury duty in Maury County, but in most cases they requested to be excused and such requests were honored.

"Judge Ingram testified that negroes had not been excluded from jury duty since 1942 in Maury County. Upon examining the jury commissioner's records, Judge Ingram was able to identify not less than twenty-two negroes who were members of the jury panel at the time of petitioner's trial. Under these circumstances, it is clear that the petitioner has failed in his effort to establish a pattern of exclusion of negroes from jury duty in Maury County during 1949."

"Whether there has been systematic racial discrimination by administrative officials in the selection of jurors is a question to be determined from the facts in each particular case." Patton v. State of Mississippi, 332 U.S. 463, 466, 68 S.Ct. 184, 186, 92 L.Ed. 76.

"Therefore, the trier of fact who heard the witnesses in full and observed their demeanor on the stand has a better opportunity than a reviewing court to reach a correct conclusion as to the existence of that [limitation of negroes] type of discrimination." Akins v. State of Texas, 325 U.S. 398, 401, 65 S.Ct. 1276, 1278, rehearing denied, 326 U.S. 806, 66 S.Ct. 86, 90 L.Ed. 491.

The standard of review in this case, as in other civil cases tried by a district judge sitting without a jury, is that the findings of fact of the district judge will not be set aside unless they are "clearly erroneous." Rule 52(a), Federal Rules of Civil Procedure.

"Our delicate and serious responsibility of compelling state conformity to the Constitution by overturning state criminal convictions, should not be exercised without clear evidence of violation." Brown v. Allen, 344 U.S. 443, 482, 73 S. Ct. 397, 420, 97 L.Ed. 469, rehearing denied [Speller v. Allen], 345 U.S. 946, 73 S.Ct. 827, 97 L.Ed. 1370.

The applicable Tennessee statutes relevant to the qualifications of jurors which were in effect in 1949 at the time of appellant's conviction were as follows:

"Every male citizen who is a freeholder or householder, and twenty-one years of age, is legally qualified to act as a grand or petit juror, if not otherwise incompetent under the express provisions of this Code." Williams Tenn.Code, Sec. 10006. Subsequently substantially changed—see T.C.A. Sec. 22–101.)

Incompetent persons. "Persons convicted of certain infamous offenses, specially designated in this Code, persons of unsound mind, persons not in the full possession of the senses of hearing and seeing, and habitual drunkards, are incompetent to act as jurors." Williams Tenn.Code, Sec. 10009; now T.C.A., Sec. 22–102.

Occupational and disability exemptions. "The following persons are exempt from liability to act as jurors: All persons holding office under the laws of the United States, or of this state; all employees of the railway mail service; all practicing attorneys, physicians, and clergymen; all acting professors or teachers of any college, school, or institution of learning; all members of fire companies; all persons over sixty-five years of age, disabled by bodily infirmity, or specially exempted by any other positive law; all pharmacists registered under and in accordance with the laws of the state; service in the national guard shall be accepted in lieu of all jury duty while actually in the military service of the state." Williams Tenn.Code, Sec. 10010; now T.C.A., Sec. 22–103.

Excuse from service. "Any person may be excused from serving as a juror, when the state of his own health, or that of his family, requires his absence, or when, for any reason, his own interests, or those of the public, will, in the opinion of the court, be materially injured by his attendance." Williams Tenn.Code, Sec. 10011; now T. C.A., Sec. 22–104.

Disqualification by interest or relationship. "No person can act as a juror in any case in which he is interested, or when either of the parties is connected with him by affinity or consanguinity, within the sixth degree, computing by the civil law, except by consent of all the parties." Williams Tenn.Code, Sec. 10007; now T.C.A., Sec. 22–105.

In 1949 there was in effect a private statute applicable to Maury County, which governed the method of selecting lists of prospective jurors. The act,

which created a county board of jury commissioners, provided that:

"Sec. 5. Be it further enacted, That it shall be the duty of the Jury Commissioners biennially on the first Monday in July, or upon the call of the Chairman, upon any day within thirty days thereafter, to meet and select from the tax books of the county and from any reliable sources the names of upright, intelligent men, known for their integrity, fair character, and sound judgment, from the various civil districts of the county and in proportion to the population of such districts, as near as may be, possessing the qualifications as required by law * * *" Chapter 45, Private Acts of Tennessee, Extra Session, 1913.

The list selected from the tax books by the jury commissioners numbered approximately 1500. The tax books of Maury County did not designate the race of the persons listed thereon. Shortly before each term of court, all of the names on the jury commissioners list were placed in a box and a number of them (approximately 100) were drawn as prospective members of the jury panel for that term. These persons whose names were drawn were summoned for jury duty for the next succeeding term and either served or were disqualified or excused by the judge.

In Maury County the relevant census figures were as follows:

|  | 1940 | 1950 |
|---|---|---|
| Total Population | 50,357 | 40,368 |
| White | 30,225 (66.5%) | 31,782 (72.2%) |
| Negro | 10,130 (33.5%) | 8,579 (27.8%) |

The figures as to males over 21 were as follows:

|  | 1940 | 1950 |
|---|---|---|
| White | 8853 (66.9%) | 9470 (73.7%) |
| Negro | 2918 (33.1%) | 2486 (26.3%) |

The State trial judge who presided over the criminal trial of appellant was the Honorable Joe M. Ingram, who has served as judge of the Eleventh Judicial Circuit of Tennessee continuously since September 1, 1942. The following affidavit of Judge Ingram was filed in the record in the district court in the present case:

"This Statement and Affidavit is made pursuant to 28 U.S.C.A. Section 2245 and at the request of Ed. R. Davies, Special Counsel, and may be filed in the above cause and presented at the Hearing which is scheduled for Tuesday, July 7, 1964.

\* \* \* \* \* \*

"The undersigned is the duly elected, qualified Judge of the 11th Judicial Circuit of Tennessee and has been continuously since September 1, 1942. As such Circuit Judge he presides over the Criminal Court in Maury County and therefore was the presiding Judge at the trial of Brooks Lee Anderson, the Petitioner, at the time of his conviction of the charge of rape on August 1, 1949, in Case No. 5112, and sentenced to confinement in the State Penitentiary for 49 years and 1 day.

"The allegation that Negroes were systematically excluded from service on the Grand Jury and Petit Jury at the time of this trial is utterly false and without any foundation. The undersigned personally knows that since 1942 until the present time, Negroes have not been systematically excluded from service on the Grand Jury and Petit Jury in this county. In the first place, the Judge of this Court would not name Jury Commissioners that would engage in any such practice and I personally know that at the date of

this trial, Negroes had been selected and named and placed in the Jury Box for Jury Service. They certainly have not been excluded or refused service on Juries by the Court because of their race or color and from time to time may have been drawn from the Jury Box to serve on Juries and many members of the Colored Race have served on both the Grand and Trial Juries and, as a matter of fact, during the past few years at almost every term of our Circuit Court, Negroes have served on both the Grand Jury and Trial Jury.

"The reason the undersigned is so emphatic and positive about this matter is the result of a trial of the so-called race riot cases that were tried in this Court in 1946. At that time, the Defendants were represented by the N.A.A.C.P. Appointed Attorneys Thurgood Marshall, Z. Alexander Looby, a Dr. Branson, an attorney of Washington, D. C. and Maurice Weaver of Chattanooga, Tennessee.

"Counsel for the Defendants filed a Plea in Abatement to the Indictments in these cases alleging among other things that Negroes were systematically excluded from service on the Grand Jury that returned the indictments. The Court spent some two weeks or more hearing proof on this matter and it was established at that hearing that this charge was false, that there had been no systematic exclusion of Negroes from Jury service at that time and consequently the Plea in Abatement was overruled. In one of these cases, No. 4712, State vs. Lloyd Kennedy, was tried on November 11, 1946, motion for a new trial was overruled and sentence pronounced on December 6, 1946 and the case appealed to the Supreme Court of Tennessee.

"The Supreme Court of Tennessee affirmed this conviction and found that there was no error in the Trial Court's action in overruling said Plea in Abatement and later this action was approved by the Supreme Court of the

United States when certiorari was denied. I did not mean to digress so much about this matter but Mr. Davies advises in his letter that A. J. Morton of Morton Funeral Home in Columbia, Tennessee, has been subpoenaed by Petitioner for the purpose of proving the systematic exclusion of Negroes from Jury duty in Maury County at the time of this trial in 1949. Mr. Morton was one of the Defendants in the so-called race riot cases and as such was present in Court at the time it was shown in 1946 that this allegation is untrue.

"The Jury Commission of Maury County met in July, 1948, and at that time selected and deposited in the Jury Box 1501 names to make up the Grand and Trial Jury list for the next two-year period and from which Jury Box names were drawn by lot for each term of Court to make up and form the Grand Jury and Trial Jury (for two years) from that time and it was from this list of 1501 names so selected by the Jury Commission in July, 1948, that the Grand Jury was formed that indicted Brooks Lee Anderson on May 23, 1949, and the Trial Jury that tried this Defendant on August 1, 1949.

"The Court has no recollection of how many, if any, Negroes were drawn from the Jury Box that made up the Grand and Trial Juries for the May, 1949, term of the Circuit Court, but a casual examination of the Jury Commission's records on file in the office of the Circuit Court Clerk of this County (the Circuit Court Clerk is also Clerk of the Jury Commission) reveals that many names of persons selected and placed in the Jury Box at that time for jury service were members of the Colored Race.

"For example, in the rural 5th District of this County, which is the home district of the undersigned, the following Colored persons were placed on the Jury rolls by the Jury Commission in its July, 1948, meeting and placed in

said Jury Box. Their names are as follows:

Jim Amis
Henry English
Walter Braden
Jess Braden

District 9 contains the following persons selected by the Jury Commission and placed in the Jury Box that are personally known by the undersigned to be members of the Negro Race:

Archie Crosby
V. K. Greenfield
Ed Brown
Charlie Harrison
John W. Joyce
A. M. Cobble
Rufus Vestal
Will Matthews
Toby Armstrong       10th District

"District 7 contains the following names personally known by the Court to be members of the Colored Race:

Charlie Chavers
Ed Driver
Perry Dudley
Max Fleming
Henderson Hylick
Maxie Perryman
Jordan Townes
Joe Worley
Walter Woodson

"So therefore, the undersigned personally knows that there was no systematic exclusion of members of the Colored Race from Jury service in this County at the time of the trial of the Petitioner.

"This, the 4th day of July, 1964.
/s/ Joe M. Ingram"

The case of Kennedy v. State, 186 Tenn. 310, 210 S.W.2d 132, cert. denied, 333 U.S. 846, 68 S.Ct. 659, 92 L.Ed. 1129 (1947), which is referred to in the affidavit of Judge Ingram, involved the question of whether there was a systematic exclusion of Negroes from juries in Maury County in 1946. The opinion of the Supreme Court of Tennessee states that approximately eleven hundred pages of the record in that case were devoted to testimony on this question. The Supreme Court of Tennessee said:

"It should be borne in mind that members of the Negro race have no constitutional right to trial by a mixed racial jury. All that they have is a right that their race shall not be discriminated against in the selection and drawing of grand juries. The testimony of the jury commissioners is to the effect that when they placed the names of seven hundred and fifty or more taxpayers in the jury box for subsequent drawing, they were not aware as to the race of a great many of the persons whom they placed therein, but undertook to select a proportionate number of such persons from the various civil districts of the county without regard to their race. That this must be true is evidenced by other testimony in the record. A Negro teacher called by the defendant testified that he was summoned for jury duty at a time previous to the impanelment of the grand jury that indicted the defendant and was excused from jury service at his own request. The evidence further shows that at the November term 1946, at which defendant was tried, one Negro appeared for jury service and was present awaiting such until the entire panel of some fifteen members was excused by the trial judge. The evidence also shows that one member of the colored race, Henry McGlothlin, was on a list of jurors drawn from the jury box in drawing a panel to select the petit jury for the trial of this case. The proof shows that these names which were drawn from the box were placed therein by the jury commission in July, 1944, or more than a year and a half before the commission of the alleged crime in this case." 186 Tenn. at 317–318, 210 S.W.2d at 135.

■ The findings of the State court on the issue of discrimination, although not binding on the court, are entitled to great respect. Pierre v. State of Louisiana, 306 U.S. 354, 358, 59 S.Ct. 536, 83 L.Ed. 757.

Mr. Paul F. Bumpus, who served as district attorney general in Maury County from 1935 through 1950, testified that Negroes were summoned and appeared for jury duty "at practically every term of court as far as I can remember" but they generally were not willing to serve and asked to be excused; that "frequently they would have letters from their employers asking that they be excused, that they were needed badly at work." Attorney-General Bumpus did not recall having seen a Negro serve on a jury in Maury County prior to 1949.

Mr. Pride Tomlinson, Jr., who represented appellant as court-appointed attorney at his trial in 1949, testified that Negroes were included in calls for jury duty in Maury County, particularly following certain racial troubles that occurred there in 1946, but that they frequently were excused from duty on their own applications. Mr. Tomlinson did not recall having seen a Negro serving on a jury in the county prior to 1949, but testified that many Negroes have served and continue to serve on juries in the county since that time.

Appellant asserts that at the time of his trial and conviction in Maury County, Tennessee, there were three steps in the selection of jury panels:

(1) The selection from the tax books of the large list of names of prospective grand and petit jurors by Maury County's board of jury commissioners;

(2) The selection from the jury commissioners' large list of a smaller list, which list made up the prospective grand. and petit jurors for a particular term of court;

(3) A narrowing of this smaller list by disqualification or by the judge's excusing from service persons summoned therefor.

On the basis of the evidence introduced in the district court, appellant now concedes that there was no systematic exclusion in the first two steps. Therefore if systematic exclusion of Negroes did in fact take place it would be the result of step three, i.e. either by disqualification or by the judge excusing from service persons summoned therefore.

In Swain v. State of Alabama, 380 U.S. 202, 226-227, 85 S.Ct. 825, 839, the Court said that:

"Total exclusion of Negroes by the state officers responsible for selecting names of jurors gives rise to a fair inference of discrimination on their part, an inference which is determinative absent sufficient rebuttal evidence. But this rule of proof cannot be woodenly applied to cases where the discrimination is said to occur during the process of peremptory challenge of persons called for jury service. Unlike the selection process, which is wholly in the hands of state officers, defense counsel participate in the peremptory challenge system, and indeed generally have a far greater role than any officers of the State."

■ Likewise, the excusing of summoned Negro jurors from service upon their own application and for cause does not necessarily constitute systematic exclusion on account of race.

■ The fact that no Negro served on the grand jury that indicted appellant or on the petit jury that convicted him, coupled with the further fact that no witness testifying in the present case could recall having seen a Negro serving on a jury in Maury County prior to 1949, would have established a prima facie case of systematic exclusion, except for other evidence in the record. Under the evidence hereinabove outlined, and especially in view of the detailed affidavit of Judge Ingram, we cannot say that the findings of fact of the district judge in the present case are "clearly erroneous."

Judge Ingram's affidavit was introduced into evidence under the authority of 28 U.S.C. § 2245, which provides that:

"On the hearing of an application for a writ of habeas corpus to inquire into the legality of the detention of a person pursuant to a judgment the certificate of the judge who presided at the trial resulting in the judgment, setting

forth the facts occurring at the trial, shall be admissible in evidence."

■■■ To the extent that the affidavit of Judge Ingram contained statements as to matters which took place other than at the trial, we are of the opinion that it was properly admissible under the provisions of 28 U.S.C. § 2246:

"On application for a writ of habeas corpus, evidence may be taken orally or by deposition, or, in the discretion of the judge, by affidavit. If affidavits are admitted any party shall have the right to propound written interrogatories to the affiants, or to file answering affidavits."

The record in the present case discloses that, after the filing of the foregoing affidavit, the district judge allowed counsel for appellant fifteen additional days in which to propound written interrogatories or further questions to Judge Ingram, or to obtain a supplemental affidavit from him.

Although issues of fact in a habeas corpus case may not be established by ex parte affidavits alone, Walker v. Johnston, 312 U.S. 275, 287, 61 S.Ct. 574, 85 L.Ed. 830; Jones v. Cunningham, 313 F.2d 347, 349 (footnote 4, C.A. 4), cert. denied, 375 U.S. 832, 84 S.Ct. 42, 11 L.Ed.2d 63, the procedure followed by the district court in the present case was in accord with the statute and would be calculated to help maintain a desirable relationship between State and Federal courts. Both the Circuit Judge presiding over the State court in Maury County, Tennessee, and the United States District Judge for the Middle District of Tennessee are judges with original general jurisdiction. It was fitting and proper that Judge Ingram not be called to testify as a witness in federal court so long as the rights of appellant were protected. The rights of appellant were protected amply under the facts of the present case, in that his court-appointed attorney was accorded an opportunity to cross-examine Judge Ingram by interrogatories and to obtain a supplemental affidavit.

We hold that the findings of fact of the district court are not "clearly erroneous."

The judgment of the district court is affirmed.

This court takes this occasion to express its appreciation and thanks to Mr. James O. Bass, Jr. and Mr. J. Brad Reed of the Nashville bar, who, acting under appointment of the court as counsel for appellant, undertook the laborious preparation of this case on review, and submitted excellent briefs and arguments on the difficult issues presented.

McALLISTER, Senior Circuit Judge (dissenting).

Appellant, Brooks Lee Anderson, a Negro, was convicted by a jury, in the Circuit Court of Maury County, Tennessee, of the crime of rape of a girl under fifteen years of age.

The jury fixed the sentence at forty-nine years and one day. Such a heavy sentence may have been imposed because of appellant's record. He was born in 1912. In 1929, at the age of seventeen, he was arrested for housebreaking and larceny in Maury County, and committed to the State Training and Agricultural School for three years; and, as of the time of his hearing on the petition for habeas corpus on July 7, 1964, he testified that he had been in jail or prison practically all of the time since 1929 for housebreaking, concealing stolen property, and other offenses, including the sentence he was then serving for rape of an under-age girl. The deputy sheriff who assisted in arresting him testified: "I didn't want to mistreat him. As far as I was concerned, this was a case—a kind of case that his own people was trying to indict him and I wasn't trying to do nothing to him. It wasn't nothing to me. He was a [trusty] around there [at the jail after his arrest]. That's a fellow that's permitted to be on the outside of the jail —maybe locked up at hours in the night. He used to help around the kitchen and maybe helped inmates inside. The best I can remember about him, he was always a nice, quiet fellow. He never caused any trouble."

Another deputy sheriff who had assisted in taking appellant's alleged confession said that, while at the jail, appellant "probably went to the store or different places to get things for us, but he never gave any trouble that I know of. In fact, I always thought Brooks was a pretty good boy there."

At the time of the hearing on the petition for the writ of habeas corpus in the district court, appellant was fifty-two years old, and had served fifteen years of his sentence, with thirty-four more years to serve. If he lives and serves his full sentence, he will be eighty-six years old when he is released.

Appellant's confession, which he afterward repudiated, was to the effect that after he had drunk half a pint of whiskey, and when he was wandering on a path through some bushes, and saw the girl with whom he afterward had sexual relations, as the jury found, he had a revolver in his hand, and the confession stated that when the girl saw the gun, she "must have gotten scared" and "she begged me not to hurt her."

After he was convicted, appellant filed a motion for a new trial, which was dismissed at his own request. About thirteen years later, while serving the prison sentence imposed upon him, he filed a petition for a writ of habeas corpus in the Criminal Court for Davidson County, Tennessee, which was denied without a hearing, and, on appeal to the Supreme Court of Tennessee, the order denying the petition for a writ of habeas corpus was affirmed on May 8, 1963.

On August 31, 1963, appellant filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Tennessee, setting forth that his rights under the federal Constitution were violated on the ground that Negroes were systematically excluded from the jury that convicted him in the Circuit Court for Maury County, and that a confession which he had signed and which was used in his trial was illegally obtained, since he had been deprived of the right of seeing a lawyer, which he had asked for, after his arrest and prior to his indictment.

After a full evidentiary hearing in the district court, Judge William E. Miller denied the writ on the ground that appellant had failed to establish a prima facie case of purposeful discrimination or exclusion of qualified Negroes from the grand and petit juries of Maury County during the year of his trial; that the question of the claimed unlawfully obtained confession was raised for the first time in the district court; that appellant had failed to exhaust his state remedies with regard to such issue, and that the district court was without power to consider his claim for the relief based thereon.

The only issues raised by counsel for appellant on this appeal are:

(1) Whether the confession elicited from appellant, after refusal of his request for counsel was, because of the refusal of such request, obtained in violation of his rights guaranteed by the due process clause of the Fourteenth Amendment to the Constitution of the United States, and that the confession was, therefore, inadmissible in the state trial which resulted in his conviction; and

(2) Whether Negroes were systematically excluded, because of their race, from the grand jury which indicted appellant, and from the petit jury which convicted him, in violation of his rights guaranteed by the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

With regard to the question of the confession which it was claimed had been illegally obtained, because appellant had not been allowed to consult with a lawyer beforehand, it was agreed by both appellant and appellee that this question had been raised for the first time in the habeas corpus proceedings before the district court. Judge Miller found that appellant had failed to exhaust his state remedies with regard to this issue and that the court was without power to con-

sider his claim for relief based thereon. Title 28 U.S.C.A. Section 2254.

Appellant contends that, under Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the undisputed testimony of appellant that he was refused the right to consult with a lawyer, which he had requested, prior to signing the confession, is proof of the violation of appellant's right to counsel guaranteed by the Sixth Amendment, and made mandatory upon the states by the due process clause of the Fourteenth Amendment, and that the confession was, therefore, clearly inadmissible.

Appellant maintains that Escobedo v. State of Illinois, supra, should operate retroactively to protect his constitutional right to counsel. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, furthermore delineated procedures to safeguard the Fifth Amendment privilege against self-incrimination during in-custody interrogation, holding that an accused who wishes to consult with counsel cannot be questioned; that he must be warned prior to any questioning that he has the right to remain silent; that anything he says may be used against him in a court of law; that he has the right to the presence of an attorney; and that if he cannot afford an attorney, one will be appointed for him prior to any questioning, if he so desires. Escobedo and Miranda, however, apply only to trial begun after the decisions in those cases were announced.

In Johnson v. State of New Jersey, 384 U.S. 719, 731, 86 S.Ct. 1772, 1779, 16 L. Ed.2d 882, the Court said:

"We have pointed out above that past decisions treated the failure to warn accused persons of their rights, or the failure to grant them access to outside assistance, as factors tending to prove the involuntariness of the resulting confessions. See Haynes v. [State of] Washington, supra [373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513]; Spaño v. [People of State of] New York, supra [360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265]. Prior to Escobedo and Miranda, however, we had expressly de-clined to condemn an entire process of in-custody interrogation solely because of such conduct by the police. See Crooker v. [State of] California, 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448] (1958); Cicenia v. La Gay, 357 U.S. 504 [78 S.Ct. 1297, 2 L.Ed.2d 1523] (1958). Law enforcement agencies fairly relied on these prior cases, now no longer binding, in obtaining incriminating statements during the intervening years preceding Escobedo and Miranda. This is in favorable comparison to the situation before Mapp v. Ohio, 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961), where the States at least knew that they were constitutionally forbidden from engaging in unreasonable searches and seizures under Wolf v. [People of State of] Colorado, 338 U.S. 25 [69 S.Ct. 1359, 93 L.Ed. 1782] (1949).

"At the same time, retroactive application of Escobedo and Miranda would seriously disrupt the administration of our criminal laws. It would require the retrial or release of numerous prisoners found guilty by trustworthy evidence in conformity with previously announced constitutional standards."

The trial in the instant case took place in 1949. In Davis v. State of North Carolina, 384 U.S. 737, 740, 741, 86 S. Ct. 1761, 1763, 16 L.Ed.2d 895, the Court said:

"We have also held today, in Johnson v. [State of] New Jersey [384 U.S.] p. 719 [86 S.Ct. 1772] that our decision in Miranda, delineating procedures to safeguard the Fifth Amendment privilege against self-incrimination during in-custody interrogation is to be applied prospectively only. Thus the present case may not be reversed solely on the ground that warnings were not given and waiver not shown. As we pointed out in Johnson, however, the non retroactivity of the decision in Miranda does not affect the duty of courts to consider claims that a statement was taken under circumstances which violate the standards of voluntariness which had begun to evolve

long prior to our decisions in *Miranda* and Escobedo v. [State of] Illinois, 378 U.S. 478 [84 S.Ct. 1758] (1964). This Court has undertaken to review the voluntariness of statements obtained by police in state cases since Brown v. [State of] Mississippi, 297 U.S. 278 [56 S.Ct. 461, 80 L.Ed. 682] (1936). The standard of voluntariness which has evolved in state cases under the Due Process Clause of the Fourteenth Amendment is the same general standard which applied in federal prosecutions—a standard grounded in the policies of the privilege against self-incrimination. Malloy v. Hogan, 378 U. S. 1, 6–8 [84 S.Ct. 1489, 12 L.Ed.2d 653] (1964).

"The review of voluntariness in cases in which the trial was held prior to our decisions in *Escobedo* and *Miranda* is not limited in any manner by these decisions. On the contrary, the fact that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda,* is a significant factor in considering the voluntariness of statements later made. This factor has been recognized in several of our prior decisions dealing with standards of voluntariness. Haynes v. [State of] Washington, 373 U.S. 503, 510–511 [83 S.Ct. 1336, 1341–1342] (1963); Culombe v. Connecticut, 367 U.S. 568, 610 [81 S.Ct. 1860, 6 L.Ed.2d 1037] (1961); Turner v. [Commonwealth of] Pennsylvania, 338 U.S. 62, 64 [69 S. Ct. 1352, 93 L.Ed. 1810] (1949). See also Gallegos v. [State of] Colorado, 370 U.S. 49, 54, 55 [82 S.Ct. 1209, 8 L. Ed.2d 325] (1962). Thus, the fact that Davis was never effectively advised of his rights gives added weight to the other circumstances described below which made his confessions involuntary."

In the instant case, we have before us no issue as to whether the confession was voluntary. It is true that it was attempted by appellant at the hearing on the petition for habeas corpus in the district court to show that the confession was not voluntary; but subsequent evidence introduced by the Government was, apparently, so convincing to appellant that it dissipated his claim that the confession was not voluntary; and, accordingly, appellant does not now urge, on appeal, that the confession was involuntary, but only that it was elicited from him after the refusal of his request to see a lawyer subsequent to his arrest, and before indictment.

In Johnson v. State of New Jersey, 384 U.S. 719, 731, 86 S.Ct. 1772, the Court said that, prior to *Escobedo* and *Miranda,* few States were under any enforced compulsion on account of local law to grant requests for the assistance of counsel; and this was one of the prevailing considerations in the Supreme Court's refusal to grant retroactive application of *Escobedo* and *Miranda.*

The confession made by appellant before indictment and after he had been refused counsel is not ground for reversal, solely on the ground that appellant was not granted his request for assistance of counsel; and, aside from the question of the exclusion of Negroes from the jury, that is the only issue he presents on this appeal. Had the trial in this case come after the decisions in *Escobedo* and *Miranda,* we would be obliged, under those authorities, to reverse. But those cases do not operate retroactively.

The denial of counsel, therefore, did not by itself render the confession inadmissible at the time of trial; and the conviction of appellant was valid as against the attack that he had been deprived of his constitutional rights, as of the time of trial, because of denial of counsel. On this issue, we prefer to base our determination thereof on the ground that denial of counsel, in this case, was not a deprivation of appellant's constitutional rights, because of the prospective operation only, of *Escobedo* and *Miranda* —rather than on the ground that appellant had not exhausted his remedies in the State Court.

In arriving at his conclusion that appellant was not denied his constitutional rights by systematic exclusion of Negroes from the grand jury and from the petit jury, Judge Miller reviewed the evidence taken before him on the hearing of appellant's petition for a writ of habeas corpus. He observed that such evidence showed that the census reports established that the population of Maury County at the time of appellant's indictment and trial was 25% Negro, and that there were Negroes qualified for such jury duty living in the county at that time. He further recited that Judge Joe M. Ingram, who presided at the state court trial of appellant, filed a certificate on July 4, 1964, under the authority of Title 28 U.S.C.A. Section 2245, on the habeas corpus hearing, setting forth that Negroes had not been systematically excluded from service on the grand jury and petit jury in Maury County, and that they "have not been excluded or refused service on Juries by the Court because of their race or color and from time to time many have been drawn from the Jury Box to serve on Juries and many members of the Colored Race have served on both the Grand and Trial Juries and, as a matter of fact, during the past few years at almost every term of our Circuit Court, Negroes have served on both the Grand Jury and Trial Jury."

Judge Ingram further deponed that:

"The Jury Commission of Maury County met in July, 1948, and at that time selected and deposited in the Jury Box 1501 names to make up the Grand and Trial Jury list for the next two-year period and from which Jury Box names were drawn by lot for each term of Court to make up and form the Grand Jury and Trial Jury (for two years) from that time and it was from this list of 1501 names so selected by the Jury Commission in July, 1948, that the Grand Jury was formed that indicted Brooks Lee Anderson on May 23, 1949, and the Trial Jury that tried this Defendant on August 1, 1949.

"The Court has no recollection of how many, if any, Negroes were drawn from the Jury Box that made up the Grand and Trial Juries for the May, 1949, term of the Circuit Court, but a casual examination of the Jury Commission's records on file in the office of the Circuit Court Clerk of this County (the Circuit Court Clerk is also Clerk of the Jury Commission) reveals that many names of persons selected and placed in the Jury Box at that time for jury service were members of the Colored Race.

"For example, in the rural 5th District of this County, which is the home district of the undersigned, the following Colored persons were placed on the Jury rolls by the Jury Commission in its July, 1948, meeting and placed in said Jury Box. Their names are as follows:"

He then recited the names of twenty-two members of the Negro race which had been placed on the jury rolls by the Jury Commission at its 1948 meeting.

Judge Ingram concluded his affidavit by stating:

"So, therefore, the undersigned personally knows that there was no systematic exclusion of members of the Colored Race from Jury service in this County at the time of the trial of the Petitioner."

The statute of the State of Tennessee relating to the general qualifications of jurors which was in effect at the time of appellant's indictment, trial and conviction, was as follows:

"Every male citizen who is a freeholder or householder, and twenty-one years of age, is legally qualified to act as a grand or petit juror, if not otherwise incompetent under the express provisions of this Code."

A "freeholder" is one who owns real property anywhere in the state and is

not confined to one who owns property in the particular county. In Maury County, the relevant census figures were as follows:

|  | 1940 | 1950 |
|---|---|---|
| Total Population | 50,357 | 40,368 |
| White | 30,225 (66.5%) | 31,782 (72.2%) |
| Negro | 10,130 (33.5%) | 8,579 (27.8%) |

The figures as to males over 21 were as follows:

|  | 1940 | 1950 |
|---|---|---|
| White | 8,853 (66.9%) | 9,470 (73.7%) |
| Non-White | 2,918 (33.1%) | 2,486 (26.3%) |

The other statutes relating to qualifications of jurors were as follows:

"Incompetent persons.—Persons convicted of certain infamous offenses, specially designated in this Code, persons of unsound mind, persons not in the full possession of the senses of hearing and seeing, and habitual drunkards, are incompetent to act as jurors."

"Occupational and disability exemptions.—The following persons are exempt from liability to act as jurors: All persons holding office under the laws of the United States, or of this state; all employees of the railway mail service; all practicing attorneys, physicians, and clergymen; all acting professors or teachers of any college, school, or institution of learning; all members of fire companies; all persons over sixty-five (65) years of age, disabled by bodily infirmity, or specially exempted by any other positive law; all pharmacists registered under and in accordance with the laws of the state. Service in the national guard shall be accepted in lieu of all jury duty while actually in the military service of the state."

"Excuse from service.—Any person may be excused from serving as a juror, when the state of his own health, or that of his family, requires his absence, or when, for any reason, his own interests, or those of the public, will, in the opinion of the court, be materially injured by his attendance."

"Disqualification by interest or relationship.—No person can act as a juror in any case in which he is interested, or when either of the parties is connected with him by affinity or consanguinity, within the sixth degree, computing by the civil law, except by consent of all the parties."

These statutes governed the qualifications of jurors, both for grand and petit juries, in Maury County, Tennessee, at that time.

Concerning the method of selecting a list of prospective jurors, it appears that there was in effect at that time a private act covering Maury County, Chapter 45 of the Private Acts of Tennessee with Extra Session, 1913. This act, creating a board of jury commissioners of Maury County, provided the following:

"Sec. 5. Be it further enacted, That it shall be the duty of the Jury Commissioners biennially on the first Monday in July, or upon the call of the Chairman, upon any day within thirty days thereafter, to meet and select from the tax books of the county and from any reliable sources the names of upright, intelligent men, known for their integrity, fair character, and sound judgment, from the various civil districts of the county and in proportion to the population of such districts, as near as may be, possessing the qualifications as required by law * * *."

The list selected from the tax books by the Jury Commissioners (hereinafter

called Jury Commissioners' list) numbered 1501. The tax books of Maury County did not designate the race of the persons listed thereon. Then shortly before each term of court, all of the names on the Jury Commissioners' list were placed in a box and a number of them were drawn as prospective members of the jury panel for that term. These persons were summoned for jury duty for the next succeeding term and either served or were disqualified or excused by the judge.

Appellant, therefore, submits:

"Thus, at the time of Appellant's indictment, trial and conviction in Maury County, Tennessee, there were three steps in the selection of jury panels from which grand and petit jurors were actually chosen:

(1) The selection from the tax books of the large list of names of prospective grand and petit jurors by Maury County's board of jury commissioners;

(2) The selection from the jury commissioners' large list of a smaller list, which list made up the prospective grand and petit jurors for a particular term of court;

(3) A narrowing of this smaller list by disqualification or by the judge's excusing from service persons summoned therefor.

"Official action at any of these steps which would result in no, or very few, Negroes actually serving on any grand or petit jury would amount to systematic exclusion.

"Appellant contends that the District Court's decision was addressed only to the first two of these three steps in arriving at jury panels from which jurors who actually served on grand and petit juries are selected. And Appellant, on the basis of the evidence introduced in the District Court, cannot quarrel with the decision on those points. However, a thorough analysis of all the evidence clearly shows that Negroes, before and at the time of Appellant's conviction, in fact were not serving on grand and petit juries in Maury County. In view of the substantial number (and percentage of the total population) of qualified Negroes, this fact can be explained *only* on the basis of systematic exclusion; any other attempted explanation *too severely taxes credulity.*"

Many witnesses for appellant, as well as for appellee, testified, without contradiction, that prior to 1950 and up to and including appellant's trial, they had never seen or heard of any Negroes serving on a grand or petit jury in Maury County, although it appears from the testimony of the District Attorney General of Maury County, who served in that office between 1935 and 1950, that there were "many, many" Negro businessmen in that county during that time, thereby, in effect, stating that up to and including appellant's trial, many Negroes who were qualified for jury service had never served on a grand or petit jury during the period up to and including appellant's trial.

Appellant, on the basis of the foregoing testimony, contends:

"Thus, all of the evidence produced in the District Court, Appellee's as well as Appellant's, is to the effect that, at the time and prior to Appellant's indictment, trial and conviction, no Negro in the memory of any witness had ever actually served on either a grand jury or petit jury in a criminal case in Maury County. This in a county where, according to the best available statistics, between $\frac{1}{4}$ and $\frac{1}{3}$ of the persons qualified for jury service were Negroes. How can this be? Some of Appellee's witnesses testified that Negroes asked to be excused more often than white persons. All of them? Even if this rather incredible assertion is taken as true, it would seem clear that systematic excusing equals systematic exclusion.

\* \* \* \* \*

"In summary, Appellant contends that the evidence admits of no interpretation except that Negroes were systematically excluded, because of

their race, from the grand jury which indicted him and from the petit jury which tried and convicted him. He was thus denied the equal protection of the laws."

The uncontradicted evidence in this case is to the effect that no one had ever known of any Negroes serving as jurors on the grand jury, or on a trial in Maury County up to and including the time of the trial of appellant.

In Eubanks v. State of Louisiana, 356 U.S. 584, 585, 78 S.Ct. 970, 972, 2 L.Ed. 2d 991, Mr. Justice Black, speaking for the Court, said:

"In an unbroken line of cases stretching back almost 80 years this Court has held that a criminal defendant is denied the equal protection of the laws guaranteed by the Fourteenth Amendment if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race. Our only concern here is with the application of this established principle to the facts disclosed by the record now before us.

\*     \*     \*     \*     \*

"In Patton v. [State of] Mississippi, 332 U.S. 463, 469 [68 S.Ct. 184, 187, 92 L.Ed. 76], this Court declared, in a unanimous opinion, that 'When a jury selection plan, whatever it is, operates in such way as always to result in the complete and long-continued exclusion of any represenatative at all from a large group of Negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand.' This is essentially the situation here. True, the judges now serving on the local court testified generally that they had not discriminated against Negroes in choosing grand juries, and had only tried to pick the best available jurors. But as Chief Justice Hughes said for the Court in Norris v. [State of] Alabama, 294 U.S. 587, 598 [55 S.Ct. 579, 584, 79 L.Ed. 1074], 'If, in the presence of such testimony as defendant adduced, the mere general assertions by

officials of their performance of duty were to be accepted as an adequate justification for the complete exclusion of negroes from jury service, the [Equal Protection Clause]—adopted with special reference to their protection—would be but a vain and illusory requirement.' Compare Reece v. [State of] Georgia, 350 U.S. 85, 88 [76 S.Ct. 167, 169, 100 L.Ed. 77]; Hernandez v. [State of] Texas, 347 U.S. 475, 481 [74 S.Ct. 667, 671, 98 L.Ed. 866]."

In Norris v. State of Alabama, 294 U.S. 587, 589, 55 S.Ct. 579, Mr. Chief Justice Hughes, speaking for the Court, laid down the applicable law as follows:

"First. There is no controversy as to the constitutional principle involved. That principle, long since declared, was not challenged, but was expressly recognized, by the Supreme Court of the State. Summing up precisely the effect of earlier decisions, this Court thus stated the principle in Carter v. [State of] Texas, 177 U.S. 442, 447 [20 S.Ct. 687, 44 L.Ed. 839,] in relation to exclusion from service on grand juries: 'Whenever by any action of a State, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States. Strauder v. West Virginia, 100 U.S. 303 [25 L.Ed. 664]; Neal v. [State of] Delaware, 103 U.S. 370, 397 [26 L.Ed. 567]; Gibson v. [State of] Mississippi, 162 U.S. 565 [16 S.Ct. 904, 40 L.Ed. 1075].' This statement was repeated in the same terms in Rogers v. [State of] Alabama, 192 U.S. 226, 231 [24 S.Ct. 257, 48 L.Ed. 417] and again in Martin v. [State of] Texas, 200 U.S. 316, 319 [26 S.Ct. 338, 50 L.Ed. 497]. The principle is equally applicable to a similar exclusion of negroes from service on petit juries.

Strauder v. West Virginia, supra; Martin v. [State of] Texas, supra.

\* \* \* \* \*

"Defendant adduced evidence to support the charge of unconstitutional discrimination in the actual administration of the statute in Jackson County. The testimony, as the state court said, tended to show that 'in a long number of years no negro had been called for jury service in that county.' It appeared that no negro had served on any grand or petit jury in that county within the memory of witnesses who had lived there all their lives. Testimony to that effect was given by men whose ages ran from fifty to seventy-six years. Their testimony was uncontradicted. It was supported by the testimony of officials. The clerk of the jury commission and the clerk of the circuit court had never known of a negro serving on a grand jury in Jackson county. The court reporter, who had not missed a session in that county in twenty-four years, and two jury commissioners testified to the same effect. One of the latter, who was a member of the commission which made up the jury roll for the grand jury which found the indictment, testified that he had 'never known of a single instance where any negro sat on any grand or petit jury in the entire history of that county.'

"That testimony in itself made out a *prima facie* case of the denial of the equal protection which the Constitution guarantees. \* \* \* "

Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 825, held that the exclusion of Negroes from a trial jury by the means of peremptory challenges exercised by the Prosecuting Attorney for the State is not the kind of discrimination that violates the constitutional rights of an accused to the equal protection of the laws under the Fourteenth Amendment.

The undisputed fact that no one had ever known of any Negroes serving as jurors on a trial in Maury County up to and beyond the time of the trial of appel-lant made out a prima facie case of the denial of the equal protection to appellant which the Constitution guarantees.

Judge Ingram's affidavit, heretofore mentioned, was introduced in evidence under the authority of Title 28 U.S.C.A., Section 2245, which provides that, on an application for a writ of habeas corpus to inquire into the legality of the detention of a person pursuant to a judgment, the certificate of the judge who presided at the trial resulting in the judgment, *setting forth the facts occurring at the trial,* should be admissible in evidence.

Many of the statements contained in Judge Ingram's affidavit related to facts that did not actually occur at the trial. He stated that the allegation that Negroes were systematically excluded from service on the Grand Jury and Petit Jury at the time of this trial was utterly false and without foundation. This is a conclusion, except as far as his own action goes. He also stated that he personally knew that "since 1942 until the present time, Negroes have not been systematically excluded from service on the Grand Jury and Petit Jury in this county." This is also a conclusion except as to his own action in the matter. He further stated that "the Judge of this Court would not name Jury Commissioners that would engage in any such practice and I personally know that at the date of this trial, Negroes had been selected and named and placed in the Jury Box for Jury Service." Judge Ingram might well have believed what he said of the Jury Commissioners and what he thought their conduct was, but it does not appear that he knew such fact of his own knowledge. As to Negroes having been placed in the jury box for jury service, this means only that Negroes were selected and named on the list which had been prepared, as available for duty as jurors on grand or petit juries. "Jury box" customarily means "A place set apart for the jury to sit in during the trial of a cause." Bouvier's Law Dictionary, Unabridged, Rawles Third Edition, Vol. I. As used by Judge Ingram in his affidavit, "jury box" means the box in which all of the names of

available jurors, selected by the Jury Commission, were placed, and from which box such names were drawn by lot for each term of court, to make up and form the grand jury and the petit jury. So that, in respect to the jury box mentioned in the affidavit by Judge Ingram, there can be no conclusion drawn that, from all of the names selected by the Jury Commission as persons available for jurors, any of them were ever selected as grand jurors or jurors on the trial of cases, up to and including the time of the trial of appellant.

There is a further statement in the affidavit by Judge Ingram that appears to bear upon the issue. He states that: "They certainly have not been excluded or refused service on Juries of the Court because of their race or color and from time to time many have been drawn from the Jury Box to serve on Juries and many members of the Colored Race have served on both the Grand and Petit Juries, *and, as a matter of fact, during the past few years at almost every term of our Circuit Court, Negroes have served on both the Grand Jury and the Trial Jury.*" (Emphasis supplied.)

We cannot read the foregoing as a sworn statement that, of his own knowledge, Judge Ingram knew that Negroes had served on trial juries up to and including the trial of appellant; but, rather, we read it as a statement that "during the past few years," Negroes have served on grand juries and trial juries in Maury County.

Appellee relies, with respect to the issue of exclusion of Negroes from the jury that tried appellant, upon Kennedy v. State, 186 Tenn. 310, 210 S.W.2d 132, cert. den. 333 U.S. 846, 68 S.Ct. 659, 92 L.Ed. 1129.

The *Kennedy* case arose from a criminal trial in Maury County at which Judge Ingram presided, in which the accused was found guilty. On appeal to the Supreme Court of Tennessee, the court said:

"It is next insisted that the court erred in not holding that the defendant was discriminated against by the exclusion of Negroes from the grand jury.

"On the hearing of the plea in abatement, the defendant introduced a number of witnesses whose testimony is that in their memory and for the past fifty years, no Negro had served on either the grand or petit jury in Maury County. The State's evidence showed that Maury County operated under a jury commission law; that the jury commissioners for the county met in July, 1944, and that they then filled the jury box by taking names from the 1943 tax books; and that these tax books contained no identifying symbols whereby the race of any taxpayer might be known. The evidence further showed that at the February 1946 term of court, at which the defendant was indicted, there was drawn from the jury box a list of one hundred and nine names to be summoned for jury service at that term of court. Of these one hundred and nine names so drawn, ten are shown to belong to the colored race. The record discloses that two of these so drawn of the colored race had died in the *interim* between July, 1944, when their names were put in the box, and the date of their being summoned for jury service; that one had removed from Maury County; and that two were actually summoned and excused at their own request. The record fails to disclose what became of the other five.

"The State concedes that a presumption of discrimination can arise from a showing that no Negroes have either been summoned for jury service or have served on grand juries for so long a period of time as to give rise to the belief that the failure is deliberate rather than accidental, but the State insists that such a presumption must yield to the undisputed facts when the question of discrimination is raised. There is no contention made of disproportionate representation of the Negro race on these panels, but the claim

made is that of an utter absence of such representation.

"In Norris v. [State of] Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074, 1077, the evidence showed an apparent tampering with the list from which the jury had been selected so as to evidently substitute the names of several Negroes upon such list for members of the white race. In that case the excerpt relied upon by the defendant shows that no names of Negroes were placed on the jury roll. In the present case the testimony shows that the names of ten Negroes were placed on the jury list.

"In Akins v. [State of] Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692, it was held that where the jury commissioners placed the name of one Negro on a panel of sixteen from which the grand jury should be drawn, this fact evidenced an intent not to discriminate against members of the colored race.

"It should be borne in mind that members of the Negro race have no constitutional right to trial by a mixed racial jury. All that they have is a right that their race shall not be discriminated against in the selection and drawing of grand juries. The testimony of the jury commissioners is to the effect that when they placed the names of seven hundred and fifty or more taxpayers in the jury box for subsequent drawing, they were not aware as to the race of a great many of the persons whom they placed therein, but undertook to select a proportionate number of such persons from the various civil districts of the county without regard to their race. That this must be true is evidenced by other testimony in the record. A Negro teacher called by the defendant testified that he was summoned for jury duty at a time previous to the impanelment of the grand jury that indicted the defendant and was excused from jury service at his own request. The evidence further shows that at the November term 1946, at which defendant was tried, one Negro appeared for jury service and was present awaiting such until the entire panel of some fifteen members was excused by the trial judge. The evidence also shows that one member of the colored race, Henry McGlothlin, was on a list of jurors drawn from the jury box in drawing a panel to select the petit jury for the trial of this case. The proof shows that these names which were drawn from the box were placed therein by the jury commission in July, 1944, or more than a year and a half before the commission of the alleged crime in this case.

*     *     *     *     *     *

"It is next insisted that the lower court erred in overruling the motion to quash the panel of the petit jurors upon the ground of unlawful discrimination against members of the colored race. The record shows that from the jury box there were drawn forty-six names for the petit jury in this case, and that later the Trial Judge declared an emergency and directed the summoning of twenty-six additional veniremen or a total of seventy-two in all. Of these thirteen were summarily discharged by the trial court for ineligibility, ill health, and other valid reasons, leaving fifty-two who were actually examined as to their qualifications. Four of the fifty-nine were members of the colored race. This shows that there was no discrimination. See Akins v. [State of] Texas, supra. We do not think that the trial court erred in declining to quash this panel."

On the foregoing facts, the Supreme Court of Tennessee held that there was no presumption of discrimination arising from the showing that Negroes had been excluded from jury service; and this holding undoubtedly supports the contention of appellee on this appeal, for it appears that in the *Kennedy* case, it was disclosed that, although the names of Negroes had been included on the list from which grand jurors or trial jurors were selected, there was no evidence to contradict the claim of appellant therein

that no Negroes had ever been known to have served on a grand or petit jury at that time.

It is emphasized that in the case of Kennedy v. State, supra, certiorari was denied by the Supreme Court in Kennedy v. State of Tennessee, 333 U.S. 846, 68 S.Ct. 659. We have, however, been told on a number of occasions by the Supreme Court that denial of certiorari means nothing as far as concerns the correctness of the judgment sought to be reviewed, even when constitutional questions are involved therein, that no Negroes had ever been known to serve on a grand or petit jury at that time.

Akins v. State of Texas, 325 U.S. 398, 65 S.Ct. 1276, cited in the opinion of the Supreme Court of Tennessee in Kennedy v. State, supra, said:

"Petitioner's sole objection to the grand jury is that the 'commissioners deliberately, intentionally and purposely limited the number of the Negro race that should be selected on said grand jury panel to one member.' Fairness in selection has never been held to require proportional representation of races upon a jury. [State of] Virginia v. Rives, 100 U.S. 313, 322–323 [25 L.Ed. 667]; Thomas v. State of Texas, 212 U.S. 278, 282 [29 S.Ct. 393, 53 L.Ed. 512]. Purposeful discrimination is not sustained by a showing that *on a single grand jury* the number of members of one race is less than that race's proportion of the eligible individuals. The number of our races and nationalities stands in the way of evolution of such a conception of due process or equal protection. Defendants under our criminal statutes are not entitled to demand representatives of their racial inheritance upon juries before whom they are tried. But such defendants are entitled to require that those who are trusted with jury selection shall not pursue a course of conduct which results in discrimination 'in the selection of jurors on racial grounds.' Hill v. [State of] Texas, supra, 316 U.S. 404 [62 S.Ct. 1159, 86 L.Ed. 1559].

*Our directions that indictments be quashed when Negroes, although numerous in the community, were excluded from grand jury lists have been based on the theory that their continual exclusion indicated discrimination* and not on the theory that racial groups must be recognized. Norris v. [State of] Alabama, supra; Hill v. [State of] Texas, supra; Smith v. [State of] Texas, supra." (Emphasis supplied.)

The Supreme Court held, however, that in the *Akins* case, supra, there was no purposeful exclusion of Negroes from jury duty on the particular grand jury that indicted the defendant.

In Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77, petitioning Negroes who had been indicted by an all-white grand jury in North Carolina moved to quash the indictment on the ground that Negroes had been systematically excluded from grand juries in the county in which they were indicted. The state courts denied the motion to quash. On appeal, the Supreme Court, reversing the judgment, stated:

"In support of their motion to quash the indictment because of consistent exclusion of Negroes from grand jury service, petitioners, both Negroes, offered testimony of the county tax supervisor showing that the tax records of the county, on which Negro and white persons are listed separately and from which the names of jurors are derived, revealed 12,250 white persons and 4,819 Negroes in the county, with 5,583 white men and 2,499 Negro men listed for poll tax. In addition, the clerk of the trial court testified that while there have been as many as four or five Negroes upon the regular jury panel from which grand jurors have been chosen, in his 24 years as clerk he could remember only one Negro serving on a grand jury, another having been selected but excused. This evidence was uncontradicted, the State cross-examining the witnesses but offering no evidence.

"The judgment below must be reversed. The 'testimony in itself made out a *prima facie* case of the denial of the equal protection which the Constitution guarantees.' Norris v. [State of] Alabama, 294 U.S. 587, 591 [55 S.Ct. 579]. The situation here is quite like that in Eubanks v. [State of] Louisiana, 356 U.S. 584, 586, [78 S.Ct. 970] where systematic exclusion of Negroes from grand jury duty was found. In that case:

" 'Although Negroes comprise about one-third of the population of the parish, the uncontradicted testimony of various witnesses established that only one Negro had been picked for grand jury duty within memory. * * * From 1936, when the Commission first began to include Negroes in the pool of potential jurors, until 1954, when petitioner was indicted, 36 grand juries were selected in the parish. Six or more Negroes were included in each list submitted to the local judges. Yet out of the 432 jurors selected only the single Negro was chosen.' "

In Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866, the Court said:

"In numerous decisions, this Court has held that it is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury, or before a petit jury, from which all persons of his race or color have, solely because of that race or color, been excluded by the State, whether acting through its legislature, its courts, or its executive or administrative officers.

*    *    *    *    *    *

"As the petitioner acknowledges, the Texas system of selecting grand and petit jurors by the use of jury commissions is fair on its face and capable of being utilized without discrimination. But as this Court has held, the system is susceptible to abuse and can be employed in a discriminatory manner. The exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment. The Texas statute makes no such discrimination, but the petitioner alleges that those administering the law do.

*    *    *    *    *    *

"The petitioner established that 14% of the population of Jackson County were persons with Mexican or Latin-American surnames, and that 11% of the males over 21 bore such names. The County Tax Assessor testified that 6 or 7 percent of the freeholders on the tax rolls of the County were persons of Mexican descent. The State of Texas stipulated that 'for the last twenty-five years there is no record of any person with a Mexican or Latin American name having served on a jury commission, grand jury or petit jury in Jackson County.' The parties also stipulated that 'there are some male persons of Mexican or Latin American descent in Jackson County who, by virtue of being citizens, householders, or freeholders, and having all other legal prerequisites to jury service, are eligible to serve as members of a jury commission, grand jury and/or petit jury.'

"The petitioner met the burden of proof imposed in Norris v. [State of] Alabama, supra. To rebut the strong prima facie case of the denial of the equal protection of the laws guaranteed by the Constitution thus established, the State offered the testimony of five jury commissioners that they had not discriminated against persons of Mexican or Latin-American descent in selecting jurors. They stated that their only objective had been to select those whom they thought were best qualified. This testimony is not enough to overcome the petitioner's case. As the Court said in Norris v. [State of] Alabama:

" 'That showing as to the long-continued exclusion of negroes from jury service, and as to the many negroes qualified for that service,

could not be met by mere generalities. If, in the presence of such testimony as defendant adduced, the mere general assertions by officials of their performance of duty were to be accepted as an adequate justification for the complete exclusion of negroes from jury service, the constitutional provision * * * would be but a vain and illusory requirement.'

"The same reasoning is applicable to these facts.

"Circumstances or chance may well dictate that no persons in a certain class will serve on a particular jury or during some particular period. But it taxes our credulity to say that mere chance resulted in there being no members of this class among the over six thousand jurors called in the past 25 years. The result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual jury commissioner."

In habeas corpus proceedings to secure the release of a Negro convicted of murder on the ground that colored persons were systematically excluded from jury duty where, during a period of twenty years, no Negro had been on a jury list of any kind in a county, the burden was on the state's representative to refute the prima facie case developed, United States ex rel. Goldsby v. Harpole, 263 F.2d 71 (C.A.5); and where Negroes were systematically excluded from a grand jury which indicted a colored defendant and from a petit jury which convicted him, the judgment of conviction was unconstitutional, subject to collateral attack, and was void. United States ex rel. Goldsby v. Harpole, supra.

Although the case of Kennedy v. State, 186 Tenn. 310, 210 S.W.2d 132, holds that, because the names of Negroes were selected for the jury list and placed in the box from which grand jurors and trial jurors were selected, no discrimination can be said to result from the fact that no Negroes ever served as grand jurors or trial jurors, the Supreme Court, except for denial of certiorari in the *Kennedy* case, seems never to have decided the identical question before us. But we are of the view that, regardless of the selection of names of Negroes for the jury list from which grand jurors and trial jurors are drawn, the undisputed fact that no one had ever known of any Negroes actually serving as jurors on a trial in Maury County up to and beyond the time of the trial of appellant, made a prima facie case of the denial of the equal protection of the laws which the Constitution guarantees to appellant; and the burden was upon the state's representative to refute the prima facie case so developed, rather than upon the appellant to establish that he had been deprived of his constitutional rights.

In accordance with the foregoing, the case should be remanded to the district court for further proceedings on the petition for the writ of habeas corpus. In such proceedings, the district court could properly take the testimony of Judge Joe M. Ingram on all aspects of the case involving the method by which the jury list is selected, as well as the manner of selecting panels from which grand jurors and trial jurors are secured; the reasons why Negroes have not served as trial jurors up to and including the trial of appellant—all of which may have more probative force than the statement or certificate of Judge Ingram, which was not subject to inquiry by appellant's counsel; and the district court could also properly receive further testimony from any persons, which bears upon the question whether Negroes were or were not improperly excluded from the jury which convicted appellant.

In this dissenting opinion, I cheerfully acknowledge the force and merit of the prevailing opinion written by Judge Phillips.